# In re FARMERS INSURANCE CO., INC., FCRA LITIGATION.

### This document relates to Corl, Watts & Mobbs.

### Case No. CIV–03–158–F. MDL No. 1564.

United States District Court, W.D. Oklahoma.

Sept. 20, 2010.

---

& Sherwood, Oklahoma City, OK, Jason B. Stephens, Stevens & Anderson LLP, Fort Worth, TX, Jeffrey J. Angelovich, Nix Patterson & Roach LLP, Daingerfield, TX, Richard A. Adams, Patton Roberts McWilliams & Capshaw LLP, Texarkana, TX, Joe K. Longley, Law Office of Joe K. Longley, Philip K. Maxwell, Law Office of Philip K. Maxwell, Stephen Lynn McCleery, Austin, TX, Earl P. Underwood, Jr., Law Office of Earl P. Underwood Jr., Fairhope, AL, Bruce N. Adams, Rice & Adams PC, Anniston, AL, David Russell Donaldson, Tammy McClendon Stokes, Donaldson & Guin LLC, Birmingham, AL, David A. Szwak, Bodenheimer Jones Szwak & Winchell, Shreveport, LA, Douglas Bowdoin, Douglas Bowdoin PA, Orlando, FL, Robert Q. Keith, Keith Weber & Mostly, Johnson City, TX, Rod Bowdoin, Darby Peele Bowdoin Payne & Kennon, Lake City, FL, Terry A. Smiljanich, W. Christian Hoyer, James Hoyer Newcomer & Smiljanich PA, Tampa, FL, Ian B. Lyngklip, Lyngklip & Taub Consumer Law Group PLC, Southfield, MI, Robert K. Shelquist, Lockridge Grindal Nauen PLLP, Minneapolis, MN, for Donna S. Mobbs, David L. Watts, Jr., Edward Clark, Thomas Ripley, Ellery H. Ross, Kevin L. Williams, Brent Johnson and All Others Similarly Situated, Arlene Hancock, Cynthia L. Hodnett, Harry Corl, Mike Braxton, Charles Davenport.

Barnes H. Ellis, Stephen A. Redshaw, Timothy W. Snider, Stoel Rives LLP, Portland, OR, Richard C. Ford, Crowe & Dunlevy, Oklahoma City, OK, Christopher R. Morris, Bassford Remele PA, Lewis A. Remele, Jr., Bassford Remele PA, Minneapolis, MN, for Farmers Insurance Company Inc., Fire Insurance Exchange, Fire Underwriters Association, Farmers Insurance Exchange, Farmers Underwriters Association, Farmers Group Inc., Farmers Insurance Group, Mid–Century Insurance Company of Texas, Farmers Texas County Mutual Insurance Company, Mid–Century

R. Martin Weber, Jr., Richard E. Norman, Crowley Norman LLP, David H. Burrow, Mithoff Law Firm, David W. Jones, Beck Redden & Secrest, Houston, TX, Gary D. Corum, D. Nathan Coulter, Shirley G. Jones, Stephen Engstrom, Wilson Engstrom Corum & Coulter, Scott Poynter, Emerson Poynter LLP, Little Rock, AR, Jennifer F. Sherrill, Rodney J. Heggy, William B. Federman, Federman

Insurance Company, Illinois Farmers Insurance Company.

Daniel K. Crane–Hirsch, Office of Consumer Litigation, Washington, DC, Kay D. Sewell, Assistant United States Attorney, Oklahoma City, OK, for Intervenor–Plaintiff the United States of America.

### *ORDER*

STEPHEN P. FRIOT, District Judge.

Before the court are Defendants' Motion for Summary Judgment (doc. no. 945) and Plaintiffs' Cross Motion for Partial Summary Judgment on Certain Affirmative Defenses (doc. no. 952). The issues have been fully briefed, and the matter is ripe for determination. Upon due consideration, the court concludes that oral argument in regard to the motions is not required.

*Background*

Plaintiffs, Harry Corl, Cynthia L. Hodnett, Nyle Cearlock, Arlene Hancock, David L. Watts, Jr. and Donna S. Mobbs, individually and on behalf of all others similarly situated, have sued defendants, Farmers Insurance Company, Inc., Farmers Group, Inc., Farmers Insurance Exchange, Fire Underwriters Association, Fire Insurance Exchange and Mid–Century Insurance Company, seeking to recover statutory damages, costs and attorneys' fees based upon defendants' alleged willful violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* In Plaintiffs' Consolidated and Amended Class Action Complaint, plaintiffs allege that defendants have instituted a corporate policy of obtaining consumer report information as to their applicants and insureds for the purpose of insurance underwriting. *See,* Plaintiffs' Consolidated and Amended Class Action Complaint (doc. no. 493), ¶ 73. They additionally allege that defendants took adverse action against each plaintiff and each class member, based on information obtained from consumer reports, but did not provide adequate notice of the adverse action to each plaintiff and each class member as required by the FCRA.[1] *Id.* at ¶ 74. They further allege that defendants' decision not to provide adequate notice of adverse action to each plaintiff and each class member was willful and deliberate.[2] *Id.* at ¶ 75. Plaintiffs and

1. Section 1681m(a) of Title 15 of the United States Code provides in pertinent part:

 If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall—
 (1) provide oral, written, or electronic notice of the adverse action to the consumer;
 (2) provide to the consumer orally, in writing, or electronically—
 (A) the name, address and telephone number of the consumer reporting agency ... that furnished the report to the person; and
 (B) a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; and

 (3) provide to the consumer an oral, written, or electronic notice of the consumer's right—
 (A) to obtain ... a free copy of a consumer report on the consumer from the consumer reporting agency ... which notice shall include an indication of the 60–day period ... for obtaining such a copy; and
 (B) to dispute ... with a consumer reporting agency the accuracy or completeness of any information in a consumer report furnished by the agency.

2. Section 1681n(a) of Title 15 of the United States Code provides in pertinent part:

 Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
 (1)(A) any actual damages sustained by the consumer as a result of the failure or

class members "seek statutory penalties from $100–$1000 per violation for Defendants' willful violation of the FCRA, and seek to recover costs and their attorneys' fees." *Id.* at ¶ 81.

On April 13, 2006, the court granted Plaintiffs' Opposed Motion for Class Certification (doc. no. 524) and certified, pursuant to Rule 23, Fed.R.Civ.P., the following class:

All individual consumers who renewed or purchased auto or homeowners insurance from Farmers Insurance Company, Inc., Mid–Century Insurance Company, Farmers Insurance Exchange, or Fire Insurance Exchange and did not receive the largest credit discount for such insurance based in whole or in part on information contained in a consumer report, and who received from Farmers Insurance Company, Inc., Mid–Century Insurance Company, Farmers Insurance Exchange, or Fire Insurance Exchange's form designated as follows:

25–7535 (version dated 6–00); or

25–7581 (version dated 9–00); or

25–7585 (version dated 9–00).

Excluded from the class are: (1) Defendants and all directors, officers, agents and employees of Defendants; (2) claims by any person or entity who timely opts out of this proceeding; (3) all currently serving federal district court judges, their current spouses, and all persons (and their current spouses) within the third degree of consanguinity to such federal district court judges and spouses; and (4) any person who has given a valid release concerning the claims asserted in this suit.

damages of not less than $100 and not more than $1,000 . . .

 \* \* \*

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with rea-

*See,* Order (doc. no. 568). In light of Supreme Court's decision in *Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007), the parties have filed motions, pursuant to Rule 23(c)(1)(C), Fed.R.Civ.P., seeking to amend the class definition. The court will address those motions in a separate order.

Defendants previously filed a motion for summary judgment which was also based, in part, on the *Safeco* decision. In a hearing conducted on November 9, 2007, the court concluded that the adverse action notices at issue did not comply with the requirements of the FCRA, 15 U.S.C. § 1681m(a). The court also concluded that the evidence is so highly conflicting that the issue of willfulness is a fact issue which must be tried. The court subsequently granted the parties leave to file additional motions for summary judgment. In the motion for summary judgment now before the court, defendants seek summary judgment, pursuant to Rule 56, Fed.R.Civ.P., on the following grounds:

1. Defendants did not take any adverse action against plaintiffs, Cynthia L. Hodnett ("Hodnett"), Nyle Cearlock ("Cearlock"), and Arlene Hancock ("Hancock"), and did not take adverse action against plaintiffs, Harry Corl ("Corl") and David L. Watts, Jr. ("Watts"), except on certain policy renewals;[3]

2. Defendants are not liable to plaintiffs Cearlock and Watts because defendants' agents provided plaintiffs with "notice of the adverse action" verbally;

3. Defendants did not willfully violate the FCRA, as a matter of law, with respect to new-business insureds;

sonable attorney's fees as determined by the court.

3. Defendants have not moved for summary judgment on adverse-action grounds against plaintiff, Donna S. Mobbs.

4. Defendants, Farmers Group, Inc. ("FGI") and Fire Underwriters Association ("FUA"), did not take adverse action with respect to any plaintiff or putative class member and as a matter of law cannot be held liable for failing to comply with § 1681m(a).

5. Defendants, Fire Insurance Exchange ("FIRE"), FUA and Mid–Century Insurance Company ("Mid–Century"), should be dismissed because no representative plaintiff has standing to sue FIRE or·FUA and the claims against Mid–Century are time-barred;

6. Plaintiffs' attempt to aggregate statutory damages under 15 U.S.C. § 1681n(a)(1)(A) on a class-wide basis is not permitted by the FCRA;

7. The statutory damages provision of the FCRA, § 1681n(a)(1)(A), is unconstitutionally vague;

8. Plaintiffs' attempt to aggregate statutory damages on a class-wide basis violates the Due Process Clause of the United States Constitution;

9. Plaintiffs are not permitted under the FCRA to recover an award of statutory damages in excess of the statutory minimum in the absence of any evidence of injury or harm to the individual class members; and

10. Plaintiffs' claims are barred because claims for violations of § 1681m(a) must be enforced exclusively by the "chief law enforcement officer" of the various states in which plaintiffs and putative class members reside, or by the appropriate federal administrative agency, as provided in 15 U.S.C. § 1681m(h)(8).

In their cross-motion for partial summary judgment, plaintiffs seek partial summary judgment, pursuant to Rule 56, on defendants' alleged affirmative defenses, including the following asserted defenses:

1. Plaintiffs' Consolidated and Amended Class Action Complaint fails to state a claim upon which relief can be granted;

2. Any statutorily required notice pursuant to the FCRA was provided to plaintiffs;

3. Reasonable procedures were maintained by defendants to assure compliance with the FCRA;

4. Each individual and putative class plaintiff lacks standing to bring claims alleged in plaintiffs' Consolidated and Amended Class Action Complaint;

5. Plaintiffs' claims are barred in whole or in part by the doctrines of waiver and/or estoppel;

6. Plaintiffs' claims are barred by the applicable statute of limitations;

7. The claims of plaintiff Watts and any putative class member insured in the State of Texas are barred by prior settlement and release;

8. Plaintiffs' attempt to aggregate statutory damages on a class-wide basis is barred by the Due Process Clause of the United States Constitution; and

9. Private enforcement of plaintiffs' claims is barred by 15 U.S.C. § 1681m(h)(8).

*Standard of Review*

Under Rule 56(c), Fed.R.Civ.P., summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. *United States v. Agri Services, Inc.,* 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir. 1983).

*Defendants' Motion for Summary Judgment*

**I. Relevant Facts**

The following relevant facts are either undisputed or viewed in a light most favorable to plaintiffs, as non-moving parties.

**A. Defendants' FARA and FPRA Discount Program and FCRA Notice**

In 1999, defendants implemented a new risk-based premium pricing program referred to as the Revised Pricing Mechanism ("RPM"). With RPM, defendants utilized for the first time consumer credit report information to rate automobile and homeowners insurance policies. The portion of the RPM pricing calculus that used credit report information to price automobile policies was called Farmers Auto Risk Assessment ("FARA"), and the portion of the RPM pricing calculus that used credit report information to price homeowners insurance policies was called Farmers Property Risk Assessment ("FPRA"). *See,* Declaration of William A. Redding in Support of Defendants' Motion to Amend Class Definition ("Redding Decl."), ¶ 3, Ex. 2 to Declaration of Timothy W. Snider in

Support of Defendants' Motion for Summary Judgment ("Snider Decl.") (doc. no. 947).

As part of the FARA and FPRA programs, defendants contracted with Trans Union Corporation ("Trans Union"), a consumer reporting agency, to obtain consumer credit information on persons insured or purchasing insurance from defendants. The contract between defendants and Trans Union provided that Trans Union would provide defendants with insurance "risk assessment" scores (hereinafter "credit-based insurance scores"). The credit-based insurance scores were obtained from consumer credit information held by Trans Union using a mathematical algorithm derived by Fair Isaac Corporation which statistically and actuarially predicts risks for insurance carriers. *See,* Declaration of Jeffrey L. Roberts in Support of Farmers' Opposition to Motion for Class Certification ("Roberts Decl."), ¶¶ 4–5 (doc. no. 531); Deposition of Jeffrey Roberts, p. 31, ll. 1–25, p. 32, ll. 1–9; Ex. 9 to Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (doc. no. 952) ("Plaintiffs' Response").

When defendants requested Trans Union to provide the credit-based insurance score for a consumer, Trans Union electronically provided defendants a single numerical score from 0–999 derived by Trans Union using the consumer credit information accumulated by Trans Union and processed through Fair Isaac's algorithm. The credit-based insurance score was then converted by defendants into an alpha or letter code (from A to Z) based on defendants' underwriting groups' determination of the underwriting results experience in the state at issue. *See,* Roberts Decl. ¶ 7. The alpha or letter code (from A to Z) is called a FARA or FPRA code. *See,* Redding Decl., ¶ 4. Each FARA and FPRA

code has an associated numeric factor called the FARA or FPRA factor. *See,* Declaration of Lynne Wehmueller in Support of Defendants' Motion for Summary Judgment ("Wehmueller Decl.") (doc. no. 946). The FARA or FPRA code affected the level of discount for which a particular insured was eligible. The closer the FARA or FPRA code was to "A," the higher the discount. Roberts Decl. ¶ 7.

Beginning in early 2000 and continuing through 2001, defendants implemented the RPM pricing program in many states. New-business insureds and existing policyholders whose policies came up for renewal were qualified for one of several RPM rating plans based on such factors as driving history, gender, past insurance claims and age, which provided a base premium rate for the particular policy. Once a policy was assigned a base premium rate within a rating plan, defendants applied a FARA or FPRA code discount to the base premium rate, derived from the insured's credit-based insurance score. Those insureds with higher credit-based insurance scores received discounts off the base premium rate, with the discount declining in relation to the FARA or FPRA code. Those insureds with the lowest credit-based insurance scores received no discount off the base rate. FARA and FPRA code discounts varied by state and company and were adjusted over time. Redding Decl., ¶ 5.

For example, upon implementation of FARA in Arkansas on January 1, 2001, a FARA code "A," with corresponding FARA factor .80, received a 20 percent discount off the base rate, while a FARA code "F", with corresponding FARA factor .95, received a 5 percent discount, and a FARA code "Z," with corresponding FARA factor 1.0, received no discount. Upon implementation of FPRA in Arkansas on April 16, 2002, a FPRA code "A," with corresponding FPRA factor of .55,

received a 45 percent discount off the base rate, a FPRA code "F," with corresponding FPRA factor .67, received a 33 percent discount and a FPRA code "Z," with corresponding FPRA factor 1.0, received no discount. Redding Decl., ¶ 5, Wehmueller Decl., ¶¶ 4–5.

When defendants implemented the RPM pricing program, they intended the FARA and FPRA discounts as a whole to be revenue neutral across their book of business. However, because FARA and FPRA provided discounts off from defendants' base premium rates, in many states the base rates were increased in order to maintain revenue neutrality for this factor (referred to as "base rate offsets"). The amount of any base rate varied by state, by company and by product line. At the same time as base-rate offsets were implemented, base rates were often increased for other reasons as well. Redding Decl., ¶ 10.

Defendants' RPM program was set up as it was in large part because of a marketing opportunity. According to Ruth Howald, defendants' Senior Actuary and Texas Auto Product manager, "it was better to say you don't surcharge anybody for this particular time. You offer a discount to those who qualify." Ex. 5 to Plaintiffs' Response to Defendants' Post-*Safeco* Motion for Summary Judgment (doc. no. 828), p. 212, ll. 13–14, 23–25, p. 213, l. 1. Defendants knew that giving a discount from a high base rate was mathematically identical to applying a surcharge to a low base rate. *Id.,* p. 212, ll. 23–25, p. 213, ll. 1–4.

As part of the implementation of the FARA and FPRA program, defendants created the FCRA notices that are the subject of this lawsuit (Forms 25–7535 (version dated 6–00), 25–7581 (version dated 9–00) and 25–7585 (version dated 9–00)) and sent the notices to each insured (new business and renewal insureds) who did

not receive the largest FARA or FPRA discount. The FCRA notices were sent in the insureds' new business or renewal policy packets. The policy packets included a notice of the premium amount that was charged to each insured. The FCRA notices were used by defendants from implementation of FARA and FPRA until September 2002, when they were replaced. Redding Decl., ¶ 8. The court, as stated, has previously concluded that the FCRA notices at issue in this case did not comply with the FCRA.

**B.** *Defendants Used FARA and FPRA Code and Discount Factors to Price Plaintiffs' Insurance Coverage*

Following the implementation of FARA and FPRA, defendants charged premiums to plaintiffs based in part on plaintiffs' credit-based insurance scores and corresponding FARA and FPRA codes and discount factors. In new-business or renewal insurance packets sent to plaintiffs, defendants included a bill for the premium and a written FCRA notice if a plaintiff did not receive the largest FARA or FPRA discount applicable at the time.

**C.** *Conversations Between Defendants' Agents and Certain Plaintiffs*

In August 2001, defendants sent plaintiff Cearlock a written FCRA notice along with his renewal bill. At that time, defendants had priced plaintiff Cearlock's automobile insurance premiums, in part, based upon a FARA code "G" with a corresponding FARA factor .82, resulting in an eighteen percent discount. Plaintiff Cearlock then contacted his insurance agent, Dana Hotho (Priddy), in or around August 2001. In his deposition, plaintiff Cearlock testified as follows about that conversation:

Q. [D]id [Ms. Hotho] explain to you at that time the whole credit score and process that Farmers went through?

A. Yes.

[W]e talked about this credit score. I said well, what is my score? She said I don't know. Let me check on the computer. So she gets on the computer. She said, oh, it's a G. I said and what does a G mean? She said that's good. I said what is the top score? And she said A. At that time I said, no. I'm not accepting this. I want to know why I don't have an A because I'm very proud of my credit report.

. . . .

I asked her what's the top score? She said a thousand and she said but nobody gets that top score of a thousand.

. . . .

And she said—and about the—when I talked to her about A, B, C, D rating she said we only have two people in our—in this city that has an A rating.

*See,* Deposition of Near Cearlock, p. 32, ll. 18–20; p. 33, ll. 4–11; p. 34, ll. 7–9, 13–15, Ex. 5 to Snider Decl. (doc. no. 947). Following this discussion, plaintiff Cearlock obtained a copy of his credit report, found errors, corrected them, informed defendants of the corrections and received a refund. Defendants' records reflect that on September 12, 2001, defendants revised plaintiff Cearlock's FARA code from "G" to "D," and refunded Cearlock the premium difference for his March 10, 2001 renewal and his September 10, 2001 renewal. Ex. 4 to Snider Decl. (doc. no. 947). Plaintiff Watts also had a conversation with his insurance agent, which according to plaintiff Watts occurred in August of 2002. In his deposition, plaintiff Watts testified as follows:

A. I believe the thrust of the lawsuit is focused on the house insurance and use of the credit score as it relates to the house. We believe, I believe, I'm convinced that the cars were also rated in excess. The premiums were high be-

cause of the improper use of credit scores.

Q. You said you were convinced that the cars were also rated in excess. What is it that convinces you?

A. The local agent [Phillip Smith] told me that the premiums we were paying for both the house and the cars were high because, in part, of credit scores we had been assigned by Farmers.

Q. You said that you talked to [Mr. Smith] and he told you that the increase in the premiums were in part caused by the credit score?

A. Yes.

. . . .

With respect to the house, he offered two explanations that I recall. Number one, he blamed some of the extreme increase we saw on the mold issue. Number two, he went on to say; he and his staff went on to say let's check your credit scores and see what they are. They went to a computer, pulled those up, and said, ah, here's part of the problem, too. It's your credit score.

. . . .

They said there are two scores. One for the house and one for the car. As I recall, both were a G. I said, what does G mean? I've got no clue. They said, A is best. Z is worst. I said, that doesn't make much sense because I know our credit scores, at least what I thought of as financial credit scores, had been very high. And that's when I became aware of the credit scores.

*See,* Deposition of David Lee Watts, Jr., p. 17, ll. 4–22; p. 18, ll. 1–8, 11–18, 21–23, Ex. 7 to Snider Decl. (doc. no. 947). After the conversation with his insurance agent, plaintiff Watts also obtained a copy of his credit report, found errors and made cor-

rections. *Id.,* p. 23, ll. 4–16, 23–25; p. 24, ll. 1–5.

**D. *The Corl, Watts and Mobbs Complaints***

On February 6, 2003, plaintiff, Donna S. Mobbs ("Mobbs"), sued Farmers Insurance Company, Inc. ("FICI") in this district on behalf of herself and other homeowners insureds. The complaint defined the putative class as follows:

All persons in Oklahoma who purchased homeowners insurance from Farmers and who have had an adverse adjustment in the premium charge for such policies issued by Farmers based in whole or in part on information obtained by Farmers or its agents from consumer credit information about Class members and proper disclosure was not made to the Class members in accordance with the requirements of FCRA during the period February 10, 2000 through the date of the filing of this Complaint.

*See,* Class Action Complaint (doc. no. 1); Ex. 10 to Snider Decl. (doc. no. 947). The *Mobbs* complaint only alleged claims against FICI on behalf of Oklahoma homeowners insureds.

Six days later, on February 12, 2003, plaintiff Watts and Russell Autry[4] sued FGI, FICI, Farmers Insurance Exchange ("FIE"), FIRE and FUA in the Western District of Arkansas on behalf of themselves and other homeowners insureds. The complaint defined the putative class as follows:

All persons in the United States who purchased Homeowners insurance from Farmers and who were subjected to an adverse adjustment in the premium charge for such policies issued by Farmers based in whole or in part on informa-

---

**4.** Plaintiff Russell Autry was subsequently withdrawn as a plaintiff. *See,* Order (doc. no. 221).

tion contained in their credit records and who did not receive contemporaneous and proper notification that adverse action had been taken against them in accordance with the requirements of the FCRA during the two year period prior to the date of the filing of this Complaint until class certification. . . .

See, Plaintiffs' Original Class Action Complaint (doc. no. 46); Ex. 9 to Snider Decl. (doc. no. 947). The *Watts* complaint did not allege claims against Mid–Century, nor did it allege any claims on behalf of any automobile insureds.

About four months later, on June 13, 2003, plaintiffs Corl, Cearlock, Hancock and Hodnett filed a class action complaint against FICI and FGI in the Eastern District of Arkansas for violating § 1681m(a). The *Corl* complaint defined a putative class to include:

> All persons who received, renewed, and/or purchased auto and/or homeowners insurance from Defendant FICI and who did not receive Defendant FICI's lowest premium for such insurance after Defendant FICI or Defendant FGI had obtained any credit information from a consumer reporting agency relating to such person.

See, Plaintiffs' Original Class Action Complaint (doc. no. 61); Ex. 11 to Snider Decl. (doc no. 947). The *Corl* complaint asserted claims only on behalf of FICI insureds. The *Corl* complaint, however, asserted, for the first time, claims against FICI on behalf of automobile insureds.

On January 24, 2005, Plaintiffs' Consolidated and Amended Class Action Complaint was filed in the *Corl*, *Watts* and *Mobb* cases. The amended complaint substantially broadened the class to include all FICI, FIE, FIRE and Mid–Century homeowners and automobile insureds.

The amended complaint asserted claims against FGI, FICI, FIE, FIRE, FUA and Mid–Century. *See*, Plaintiffs' Consolidated and Amended Class Action Complaint (doc. no. 493); Ex. 12 to Snider Decl. (doc. no. 947); Ex. 1 to Plaintiffs' Response.[5]

E. *Other Class Action Complaints Filed*

Douglas Ashby filed a class action lawsuit against FGI in the District of Oregon on September 28, 2001. *See*, Ex. 2 to Plaintiffs' Response (doc. no. 952). The putative class was defined in the complaint as "all persons who purchased automobile, homeowner's or landlord protection insurance policies from defendant's subsidiaries from March 2000 to date." *Id.* The *Ashby* complaint was amended on April 1, 2002 to include persons who had purchased personal lines of insurance from October 28, 1999 to date. The *Ashby* complaint was again amended on May 23, 2003 substituting Farmers Insurance Company of Oregon as the defendant. The putative class was limited to persons who had purchased insurance policies from Farmers Insurance Company of Oregon. The complaint was further amended on June 15, 2006 (bringing FGI back in as a defendant) and on September 28, 2007. *See*, Ex. 1 to Plaintiffs' Response (doc. no. 952).

On July 15, 2002, Ed Clark sued FGI, FIE, Mid–Century Insurance Company of Texas and Farmers Texas County Mutual Insurance Company in the Western District of Texas. The putative class was defined as:

> All insureds or applicants for property or casualty insurance with the insurance subsidiaries of Farmers Group, Inc., and Farmers Insurance Exchange throughout the United States who, based in whole or in part upon information con-

---

**5.** The court has previously ruled that with the filing of Plaintiffs' Consolidated and Amended Class Action Complaint in all three of the *Corl*, *Watts* and *Mobbs* cases, there are three nationwide class actions. *See*, Order (doc. no. 866).

tained in a consumer report on the insured or applicant obtained by defendants, were advised by defendants that they were either: 1) rejected for an insurance policy; 2) transferred to another Farmers' subsidiary at a higher premium; 3) charged a higher premium with the same Farmers' subsidiary; or 4) were required to pay additional upfront premiums, and who received no contemporaneous notice from defendants of such adverse actions, including the information necessary under the Fair Credit Reporting Act, 15 U.S.C. § 1681m.

*See,* Class Action Complaint (doc. no. 318); Ex. 1 to Plaintiffs' Response (doc. no. 952). The complaint was amended on February 11, 2003 to include in the class all insureds or applicants who were quoted a premium that was adversely affected by their consumer report, to add FUA and FIE as defendants, and to include some additional plaintiffs. *See,* Amended Complaint (doc. no. 403); Ex. 1 to Plaintiffs' Response (doc. no. 952).

On October 27, 2003, Ellery H. Ross sued Mid–Century on behalf of himself and a class defined as:

> [C]onsumers who have been subjected to an adverse action by Defendant based in whole or in part upon information from a CRA or review of a consumer report which was not disclosed to the consumers in accordance with the requirements of the FCRA specifically 15 U.S.C. § 1681m(a).

*See,* Complaint (doc. no. 320); Ex. 1 to Plaintiffs' Response (doc. no. 952).

## II. *Discussion*

### A. *Statute of Limitations*

Defendants contend that they are entitled to summary judgment as to all FCRA claims of plaintiffs Cearlock, Hancock and Hodnett and partial summary judgment as to certain FCRA claims of plaintiffs Corl and Watts on the grounds that defendants did not take adverse action against plaintiffs within the period prescribed by the statute of limitations.

### (i). *New–Business Insureds*

The FCRA requires, among other things, that "any person [who] takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" must notify the affected consumer. 15 U.S.C. § 1681m(a). The notice to the affected consumer must point out the adverse action, explain how to reach the consumer reporting agency that reported on the consumer's credit, and tell the consumer that he can get a free copy of the report and dispute its accuracy with the consumer reporting agency. *Id.* Adverse action taken by an insurer is "a denial or cancellation of, *an increase in any charge for,* or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, *any insurance, existing or applied for,* in connection with the underwriting of insurance." 15 U.S.C. § 1681a(k)(1)(B)(i) (emphasis added).

In *Safeco Insurance Company of America v. Burr,* 551 U.S. 47, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007), the Supreme Court concluded that the determination of the initial rate charged for new insurance coverage may constitute adverse action. The Court concluded that "an increase in any charge . . . for any insurance, existing or applied for," § 1681a(k)(1)(B)(i), includes "a disadvantageous rate even with no prior dealing." *Id.* at 63, 127 S.Ct. 2201.

Although an initial rate offer can be an "adverse action," the notice called for under § 1681m(a) is required only when the adverse action is "based in whole or in part on" a credit report. *Safeco,* 551 U.S. at 63, 127 S.Ct. 2201. The Supreme Court stat-

ed that in "common talk," the phrase "based on" indicates a but-for causal relationship and thus "a necessary logical condition." *Id.* The Supreme Court therefore concluded that "an increased rate is not 'based in whole or in part on' the credit report unless the report was a necessary condition for the increase." *Id.*

In *Safeco*, the Court also identified the benchmark or baseline for determining whether a first-time rate is a disadvantage increase. The government and respondent-plaintiffs in *Safeco* had argued that the baseline "should be the rate that the applicant would have received with the best possible credit score." *Safeco*, 551 U.S. at 65, 127 S.Ct. 2201. The insurer, on the other hand, argued that the baseline "is what the applicant would have had if the company had not taken his credit score into account (the 'neutral score' rate [the insurer] used in [the insured's] case)."[6] *Id.* The Court concluded that the insurer had the better side of the argument. The Court reasoned that the "increase" baseline was more consistent with the understanding of causation it had discussed, "which requires notice under § 1681m(a) only when the effect of the credit report on the initial rate offered is necessary to put the consumer in a worse position than other relevant facts would have decreed anyway." *Id.* at 65, 127 S.Ct. 2201. The Court therefore concluded that the baseline for determining whether a first-time rate is a "disadvantage increase" is the rate the applicant would have had if the company had not taken his credit score into account (the "neutral score" rate)

rather than the rate the applicant would have received with the best possible credit score. *Id.* at 65, 127 S.Ct. 2201. Consequently, a rate initially offered for new insurance is an "increase" calling for notice under § 1681m(a) if it exceeds the neutral score rate. *Id.* at 65–66, 127 S.Ct. 2201.

In their summary judgment motion, defendants, citing in part to expert opinion, contend that in determining whether defendants took adverse action against a new-business insured, this court must compare a new-business insured's premium charge using the insured's FARA or FPRA code and the associated discount factor to the premium charge the new-business insured would have had using the FARA or FPRA code "N" and the associated discount factor. *See*, Redding Decl. ¶ 6; Declaration of John P. Tierney in Support of Defendants' Motion to Amend the Class Definition ("Tierney Decl."), ¶ 6; Ex. 3 to Snider Decl. (doc. no. 947). According to defendants, the FARA and FPRA code "N" and its corresponding discount factor were assigned to those insureds without a consumer credit report from which to derive a credit-based insurance score (referred to as a "no hit"). Defendants maintain that the use of the FARA and FPRA "N" code and the resulting discount factor produces the rate charged "if the company had not taken [a] credit report into account" and is the premium charge "calculated without reliance on credit history." Defendants argue that using the FARA and FPRA "N" code and factor as the baseline for determining

---

**6.** In *Safeco*, the Supreme Court had explained that the petitioner-defendant insurer had devised a method to "neutralize" an applicant's credit score. In determining whether an adverse-action notice should be sent to the applicant, the insurer compared the applicant's company and tier placement with the company and tier placement the applicant would have been assigned with a "neutral" credit score, "that is one calculated without reliance on credit history." *Safeco*, 551 U.S. at 54, 127 S.Ct. 2201. If using the neutral credit score would have put the applicant in a lower priced tier or company, an adverse-action notice was sent to the applicant. The applicant was not otherwise told that he would have gotten better terms with a better score.

whether a first time premium charge constitutes an adverse action is consistent with the "neutral rate" approved in *Safeco*. Consequently, defendants contend that they would only have taken adverse action against a new-business insured, thereby triggering notice under § 1681m(a), if the new-business insured's premium charge was higher than the charge would have been using the FARA and FPRA code "N" and the corresponding discount factor. *See*, Tierney Decl., ¶ 6.

Plaintiffs, also relying upon expert opinion, contend that the neutral score within the meaning of *Safeco* is the premium weighted average FARA or FPRA factor calculated across all policyholders. *See*, Initial Report of Allan I. Schwartz ("Schwartz Report"), ¶ 4, Ex. 4 to Plaintiffs' Motion to Amend Class Definition (doc. no. 911). Plaintiffs contend that the average FARA or FPRA factor is the truly "neutral score" because if every policyholder had that factor, it would result in the same overall premium to defendants. Plaintiffs assert that calculating average FARA and FPRA factors is not a novel concept for defendants. According to plaintiffs, when defendants implemented the FARA and FPRA programs, they represented to state insurance regulators that their programs were revenue-neutral— that the implementation of the programs would not result in additional revenue. Plaintiffs state that to demonstrate this revenue neutrality, defendants reported to state insurance regulators that they would need to raise their base rate by a certain percentage to offset the average FARA or FPRA discount. Plaintiffs assert, for example, that when FICI implemented its FPRA program in Arkansas, it told the state insurance department that it would implement a 27.3% FPRA code discount and a 37.6% base rate offset. In explaining these figures, FICI stated:

The "FPRA Base Rate Offset" is the amount of the increase in rates needed to offset the impact of automatically discounting our book for FPRA. That is, the average overall effect of discounting our book using FPRA is –27.3%. We want the impact of this change to be revenue-neutral, so we increase all base rates uniformly by form and territory by 37.6%, because this figure, when applied to the –27.3%, yields an overall 0.0% impact, on average, across the entire book. The impact on individual policyholders will be anywhere from –24.3% for the best risks (FPRA codes A through C) to +37.6% for the worst risks (FPRA codes O through Z)....

Ex. 5 to Plaintiffs' Motion to Amend Class Definition (doc. no. 911). Plaintiffs contend that in Arkansas the average FPRA factor of .727 (corresponding to the 27.3% average discount) was the "neutral score" because defendants would receive the same overall premium if every policyholder had that factor applied in calculating his or her rate.

Additionally, plaintiffs point out that in 2002, Colorado implemented an insurance regulation which provided that when no insurance score could be generated or no credit information was available for an applicant or insured over age 65, the insurer had to treat the applicant or insured as if he had a neutral credit history or insurance score. According to plaintiffs, defendants represented to the Colorado state regulators that the FPRA discount factors for their error or problem codes, including the "N" code, "will be set at the state average level." Furthermore, defendants represented this average to be the "Rate Neutral FPRA Discount Factor." *See*, Ex. 6 to Plaintiffs' Motion to Amend Class Definition (doc. no. 911). Thus, plaintiffs assert that defendants have calculated and applied average FARA and FPRA discount factors when they want to ensure that credit will not be used as a negative factor. According to plaintiffs, the aver-

age FARA and FPRA factors are what the Supreme Court had in mind in *Safeco* when it spoke of "identifying the benchmark for determining whether a first-time rate is a disadvantageous increase." *Safeco*, 551 U.S. at 65, 127 S.Ct. 2201.

Plaintiffs assert that the "N" discount factor cannot be considered as the neutral score. According to plaintiffs, the "N" discount factor bears no resemblance to the neutral score in *Safeco*. Plaintiffs assert that the neutral score in *Safeco* was calculated from average loss ratios. *See*, Ex. 3 to Plaintiffs' Motion to Amend Class Definition, JA–34, JA–45 (doc. no. 911). The "N" factor, plaintiffs contend, was not derived from any analysis of averages or rate neutrality. Moreover, plaintiffs contend that in many states including Arkansas, the "N" code was assigned a factor of 1.0–the same code used for the "Z" code which was used to calculate rates for the policyholders with the worst credit histories. Later, as defendants received pressure from agents and regulators, plaintiffs assert that the "N" factor was adjusted by defendants but not so as to correspond to any average or neutral scores across all policyholders. Rather, they adjusted the code to correspond to the expected losses from policyholders with that code. Plaintiffs further argue that a rate calculated using the "N" discount factor is a rate based on "information contained in a consumer report." According to plaintiffs, the "N" factor is a based upon a communication from the consumer reporting agency that the insured does not have enough information on file for an insurance score. And this communication, plaintiffs assert, results in a premium calculation similar to those with the worst credit histories. Further, plaintiffs assert that using the "N" factor as a baseline would mean that either no policyholders would be entitled to notice under § 1681m(a) (because the "N" factor was assigned a factor of 1.0) or that many policyholders with worse-than-neu-

tral FARA and FPRA factors would not be entitled to receive notice under § 1681m(a) (because the "N" factor was adjusted to better than 1.0 but not to the average FARA or FPRA factor).

Defendants, in reply, argue that nothing in *Safeco* requires that the neutral score comparison point for determining adverse action be an "average" score. Defendants contend that *Safeco* provided no substantive or objective "neutrality" standard for setting the adverse-action baseline. Defendants assert that rather than defining the neutral score by how it should be calculated, the *Safeco* Court defined the neutral score in terms of the persons to whom it is applied—those insureds who lack a credit report. Defendants maintain that the Supreme Court left to the states the obligation to place substantive limits on how persons without credit reports are charged, and that their rating system complied with the states' requirements. Defendants point out that their "N" factors were filed with and approved by the states in which they were used. Defendants contend that their use of the average factor in Colorado does not support plaintiffs' position that *Safeco* mandates use of an average factor. Defendants maintain that the use of the average factor was reached by agreement with the Colorado state regulators, and that in other states, the "N" factor that was filed and approved was not the average factor. Defendants contend that the "N" factor used in each state was neutral as defined by *Safeco* because it was used for insureds who had no credit report from which to derive a credit-based insurance score. Defendants contend that the "N" factor was calculated without reliance on credit history because "no hit" means there was no credit report and that the "N" factor is "what the applicant would have had if the company had not taken his credit score into account," *see, Safeco*, 551 U.S. at 65, 127 S.Ct. 2201, and it is the

"company's assessment of the creditworthiness of a run-of-the-mill applicant who lacks a credit report," *id.* at 72, 127 S.Ct. 2201 (Stevens, J., concurring). In addition, defendants point out that the Joint Appendix to the *Safeco* decision shows that insurer's "neutral score" and its "no hit score" were the same—both were assigned the same credit weight of 65. *See,* Joint Appendix at JA–68, Ex. 3 to Tierney Decl. (doc. no. 917). Defendants also contend that the Joint Appendix also shows that the insurer's neutral score was not average because the insurer's "no hit score"—the same score as the "neutral score"—was described by the insurer as "slightly unfavorable based on [insurer] loss experience." *Id.* at 71, 127 S.Ct. 2201. Defendants, citing to expert opinion, maintain that the "neutral" and "no hit" scores were consistent with a credit-based insurance score in the low 600s—a below-average score exceeded by 80 to 90 percent of the general population. *See,* Tierney Decl., ¶ 7. Thus, defendants contend that their "N" factor or the "no hit" factor is the neutral factor under *Safeco* and only those new business insureds charged more than the "N" factor are entitled to notice under § 1681m(a).

█ Upon review, the court concludes that the premium weighted average FARA and FPRA factor, as proposed by plaintiffs, should be utilized as "the benchmark for determining whether a first-time rate is a disadvantageous increase." *Safeco,* 551 U.S. at 65, 127 S.Ct. 2201. Unlike the insurer in *Safeco,* defendants in the case at bar did not devise a method to neutralize an applicant's credit score. However, as pointed out by plaintiffs, defendants, when required by Colorado to treat an applicant over the age of 65 as if he had a "neutral" credit history or insurance score when no insurance score could be generated, set their error or problem codes, including the "N" factor, at "the state average level." Ex. 6 to Plaintiffs' Motion to Amend Class

Definition (doc. no. 911). Defendants therefore applied the average FPRA factor to ensure that credit information was not used as "a negative factor." *Id.* And as pointed out by plaintiffs, defendants represented that their FARA and FPRA programs were "revenue-neutral," and the application of the average FARA and FPRA factor to every policyholder would result in the same overall premium to defendants. If the court were to use the "N" factor as the baseline, as urged by defendants, large numbers of new-business insureds would not be entitled to any notice of adverse action under § 1681m(a) because the "N" code in many states received a factor of 1.0, which provided no discount from the premium base rate-thereby resulting in the highest premium. As stated by plaintiffs, the "N" code was treated like the "Z" code which was used for calculating rates for policyholders with the worst credit histories. Thus, use of the "N" code and factor would result in hyponotification rather than the hypernotification with which the Supreme Court was concerned. *Safeco,* 551 U.S. at 67, 127 S.Ct. 2201. Although the "N" factor was subsequently adjusted by defendants in many instances, the court nonetheless cannot conclude the "N" code and its corresponding factor should be considered the neutral score. Moreover, the court is not convinced that use of the FARA or FPRA "N" code and its corresponding discount factor would result in a premium charge "calculated without reliance on credit history." *See, Safeco,* 551 U.S. at 54, 127 S.Ct. 2201. The court therefore concludes that the premium weighted average FARA or FPRA factor, rather than the "N" factor, is more consistent with *Safeco* as the benchmark for determining whether a first-time rate is a disadvantageous increase. The court therefore concludes that defendants took adverse action against a new-business insured if the new-business insured's premi-

um charge was higher than the charge would have been using the premium weighted average FARA or FPRA factor calculated across all policyholders, as proposed by plaintiffs. *See,* Schwartz Report, ¶ 4. Ex. 4 to Plaintiffs' Motion to Amend Class Definition (doc. no. 911).

### (ii). *Renewal Insureds*

In *Safeco,* the Supreme Court concluded that after the initial dealing between the consumer and the insurer, "the baseline for 'increase' is the previous rate or charge, not the 'neutral' baseline that applies at the start." *Safeco,* 551 U.S. at 66, 127 S.Ct. 2201. Defendants state that in addition to defining the applicable baseline for measuring an increase after the initial transaction between the consumer and insurer, the Supreme Court in *Safeco* held that the "based on" language in § 1681m(a) requires a "but-for causal relationship" between the consumer report and an "increase in any charge for ... insurance" for an adverse action to occur, thereby triggering a notice obligation. Defendants therefore contend that under *Safeco* they did not take adverse action against any insured in charging a renewal premium unless (1) they increased the insured's premium charge over the prior premium charge; and (2) the premium charge increase was caused by the insured's credit-based insurance score. To satisfy this two-part test, defendants assert that it is necessary to determine whether a renewal premium charge actually increased over a prior premium charge and to ascertain whether that premium increase was caused by the insured's FARA or FPRA discount factor or by some other cause. Defendants contend that as applied to their rating system, the causation analysis turns on whether the renewal premium charge was the first renewal premium charge involving the application of a FARA or FPRA factor (the "transition renewal"), or a premium increase over a prior renewal premium charge that was set using a FARA or FPRA factor (the "subsequent renewal").

### (a). *Transition Renewal*

According to defendants, at transition renewal, an insured's premium increase caused, in whole or in part, by a base-rate offset in excess of the insured's FARA or FPRA discount may be considered a premium increase caused by the FARA or FPRA factor. By way of illustration, defendants state that FICI began using FARA discount factors in Arkansas on January 1, 2001. According to defendants, at that time, FICI increased base rates by 3.9 percent to take into account the new FARA discounts (the base rate offset). Taking into account the effect of the 3.9 percent base rate offset and the various FARA discount factors, defendants state that FARA discount factors had the following effect on FICI renewal automobile premiums the first time a FARA discount factor was applied to the policy (the "transition renewal"), all else being equal:

| FARA CODE | FARA FACTOR | PREMIUM IMPACT |
|---|---|---|
| A, B | .80 | −16.9% |
| C | .85 | −11.7% |
| D | .90 | −6.5% |
| F, G | .95 | −1.3% |
| E, H–Z | 1.0 | +3.9% |

Defendants thus contend that FICI automobile insureds in Arkansas who had a renewal premium increase at transition renewal and who were assigned FARA codes E or H–Z had a premium increase of 3.9 percent due to their FARA factor. Defendants, however, contend that FICI automobile insureds assigned FARA codes A–D or F–G did not have a premium increase. According to defendants, those insureds had premium decreases at transition renewal due to their FARA factors, ranging from 16.9 percent to 1.3 percent. *See,* Wehmueller Decl., ¶ 4 (doc. no. 946).

Consequently, defendants contend that in Arkansas only automobile insureds with FARA codes E or H–Z can be considered as having had adverse action taken against them at transition renewal.

In addition, for illustration, defendants state that FICI began using FPRA discount factors in Arkansas on April 16, 2002. According to defendants, at that time, FICI requested and Arkansas insurance regulators approved a base rate offset of 37.6 percent to implement the FPRA discount factors. At the same time, Farmers applied for and the state approved a 41.8 percent base rate increase for other reasons. Defendants maintain that isolating the effect of the base-rate offset upon implementation of FPRA in Arkansas, renewing FICI homeowners insureds with FPRA codes A–D, F–L and N received premium decreases of between 24.3 percent and 7.8 percent due to their FPRA factor at transition renewal, all else being equal. FICI homeowners insureds with FPRA codes E, M, and O–Z had premium increases of 37.6 percent due to their FPRA code and factor at transition renewal, all else being equal. This is summarized as follows:

| FPRA CODE | FPRA FACTOR | PREMIUM IMPACT |
| --- | --- | --- |
| A–C | .55 | –24.3% |
| D, F–L, N | .67 | –7.8% |
| E, M, O–Z | 1.0 | +37.6 |

*See,* Wehmueller Decl., ¶ 5 (doc. no. 946). Thus, defendants contend that at transition renewal in Arkansas, FICI homeowners insureds who had a premium increase and were assigned FPRA codes E, M, or O–Z had a portion of their premium charge increased due to their FPRA factor. FICI homeowners insureds assigned FPRA codes A–D, F–L, or N at transition renewal did not. See, Tierney Decl., ¶ 14, Ex. 3 to Snider Decl. (doc. no. 947). Consequently, defendants contend that in Arkansas only homeowners insureds assigned FPRA codes E, M or O–Z had adverse

action taken against them at transition renewal.

Plaintiffs agree that after the initial dealing between the policyholder and the insurer, the baseline for determining an "increase" in premium is the policyholder's previous rate rather than the "neutral score" baseline. Plaintiffs acknowledge that under *Safeco,* only those policyholders who saw their premiums increase are entitled to an adverse action notice. Plaintiffs likewise acknowledge that an increase in premium does not end the inquiry. However, plaintiffs argue that the increase in premium must only be "based in whole or in part" on any information contained in a consumer report. 15 U.S.C. § 1681m(a). In support of their argument, plaintiffs rely upon the following language in *Safeco* wherein the Supreme Court stated:

[N]ot all "adverse actions" require notice, only those "based . . . on" information in a credit report. Since the statute does not explicitly call for notice when a business acts adversely merely after consulting a report, conditioning the requirement on action "based . . . on" a report suggests that the duty to report arises from some practical consequence of reading the report, not merely some subsequent adverse occurrence that would have happened anyway. If the credit report has no identifiable effect on the rate, the consumer has no immediately practical reason to worry about it (unless he has the power to change every other fact that stands between himself and the best possible deal); both the company and the consumer are just where they would have been if the company had never seen the report. And if examining reports that make no difference was supposed to trigger a reporting requirement, it would be hard to find any practical point in imposing the "based . . . on" restriction. So it makes more sense to suspect that Congress

meant to require notice and prompt a challenge by the consumer only when the consumer would gain something if the challenge succeeded.

*See, Safeco,* 551 U.S. at 63–64, 127 S.Ct. 2201. Plaintiffs assert that under the Supreme Court's standard in *Safeco,* determining whether an increase in premium for defendants' renewal policyholder was "based in whole or in part on" information in a credit report is simple. Plaintiffs state that under defendants' rating system, a policyholder with a better (lower) FARA or FPRA factor will pay a lower premium with all other things being equal. Therefore, plaintiffs assert that if a policyholder renews his policy and the premium is calculated using a FARA or FPRA factor other than the most favorable factor, any increase in premium will necessarily be based at least in part on information contained in his credit report. In other words, had the policyholder's credit report been more favorable, defendants would not have increased the premium or at least the premium increase would have been less.

To illustrate, plaintiffs assert that plaintiff Hancock was charged $255.00 for her automobile policy issued on April 4, 2001. When she renewed her policy on October 4, 2001, defendants increased the policy premium to $315.20. Plaintiffs contend that at the time of her renewal, plaintiff Hancock was assigned a FARA code of "D" and a FARA factor of .77 was used to calculate her premium. Plaintiffs contend that had the information in her credit report been more favorable, she could have been assigned a FARA code of "B" (or "A") and a FARA factor of .70 would have been used, resulting in a lower premium because of a higher discount. Hence, plaintiffs argue that the credit report of plaintiff Hancock had an "identifiable effect on the rate," *see, Safeco,* 551 U.S. at 64, 127 S.Ct. 2201, charged by defendants. Plaintiffs further argue that plaintiff Hancock had an "immediately practical reason to worry about it," *see, id.,* and if she were to improve her credit report or to challenge the information in her credit report, she "would gain something if the challenge succeeded," *see, id.,*—a lower premium.

Plaintiffs contend that defendants' proposal ignores the Supreme Court's discussion relating to the "based ... on" requirement. Plaintiffs contend that defendants only want to send adverse-action notices to insureds with premium increases "caused by the insureds' FARA or FPRA factor." Plaintiffs assert that at transition renewal, defendants believe adverse-action notices should only be sent to those policyholders with premium increases who received less than the average FARA or FPRA discount. But such proposal, plaintiffs argue, will cause policyholders such as plaintiff Hancock to see their premiums increased and not be told that their credit report is having an "identifiable effect on the rate." *See, Safeco,* 551 U.S. at 64, 127 S.Ct. 2201. Plaintiffs contend that in such cases "the self-help mechanism embodied in the FCRA's scheme of adverse action notices and the right to dispute" which is so "critical" to the purpose of the FCRA will be defeated. *See,* Ex. 14 to Plaintiffs' Motion to Amend Class Definition (doc. no. 911).

Defendants, in reply, argue that *Safeco* requires a but-for causal relationship between the premium increase and an insured's consumer credit report for an adverse action to occur. Defendants point out that the Supreme Court stated that the credit report must be a "necessary condition of the increase." *See, Safeco,* 551 U.S. at 63, 127 S.Ct. 2201. Defendants contend that plaintiffs ignore *Safeco's* causation requirement by arguing that a premium increase can be "based on" a credit report even if the increase was not

"caused by" the credit report. Defendants assert that plaintiffs' analysis overstates the impact of the insured's credit report on his or her policy premium. According to defendants, a premium increase at renewal may be due to any number of factors that have nothing to do with the insured's credit report. For example, defendants assert that if defendants increased automobile insurance base rates in Oklahoma by 20 percent due to non-credit factors, all automobile insureds in Oklahoma would have a 20 percent increase in their premium charge regardless of their credit-based insurance score and resulting FARA discount. Such a premium increase, defendants argue, would have nothing to do with an individual's credit report. But under plaintiffs' test, defendants argue, every insured who did not have the best FARA discount would have suffered an adverse action due to his statewide base rate increase, regardless of the insured's credit report information or corresponding credit-based insurance score and Oklahoma insureds would be deluged with FARA notices, resulting in hypernotification. Defendants point out that plaintiffs' less-than-the-best-factor argument was rejected in a similar case, *Ashby v. Farmers Insurance Company of Oregon*, 565 F.Supp.2d 1188 (D.Or.2008). Further, defendants point out that plaintiffs' policy argument to support their actual-increase-plus-less-than-the-best-discount analysis (that adverse action notices might cause insureds to check their credit report, find errors and obtain a lower premium) was made and rejected in *Safeco*. *See, Safeco*, 551 U.S. at 66–67, 127 S.Ct. 2201.

■ Upon review, the court concludes that defendants' position is more consistent with the teaching of *Safeco*. The court concludes that the premium increase at transition renewal must bear a but-for causal relationship to the insured's credit report. The increase must be "caused by" the FARA or FPRA factor. Therefore, as articulated by defendants' expert, "an insured's premium increase at transition renewal caused by a base rate offset in excess of the insured's FARA or FPRA discount may be considered a premium increase caused by the FARA or FPRA factor." *See,* Tierney Decl., ¶ 13, Ex. 3 to Snider Decl. (doc. no. 947). Expressed mathematically, "the inverse of the policyholder's FARA or FPRA factor (1.0 divided by the policyholder's FARA or FPRA factor) is less than the base rate offset (1.0 plus the base rate offset percentage) applied at implementation of FARA or FPRA in a given state." *Id.*[7]

#### (b). *Subsequent Renewals*

For a renewal premium increase to have been caused by an insured's FARA or FPRA factor at subsequent renewal, defendants contend that three conditions must have been met: (1) the insured's premium must have increased over the prior renewal premium charge; (2) the increase must have been accompanied by a worsening of the insured's credit-based insurance score; and (3) the lower credit-based insurance score must have caused a negative change in the insured's FARA or FPRA factor discount.

Plaintiffs do not agree with defendants' proffered test for subsequent renewals. They argue that this test, which requires a policyholder to have an increase in premi-

---

**7.** In their briefing, plaintiffs state that if the court accepts defendants' argument that a renewal increase must be caused by the insureds' FARA or FPRA factor, they believe that defendants have articulated a proper test for the "transition renewal" policyholders. *See,* Plaintiffs' Motion to Amend Class Definition (doc. no. 911), p. 19.

um based on a worse credit score, ensures that very few policyholders will ever receive an adverse action notice after the transition renewal because defendants obtain a new credit report on customers only once every three years. Moreover, plaintiffs assert that under their test, defendants could assign a policyholder a worse FARA or FPRA code or raise a policyholder's FARA or FPRA factor to cause an increase in the premium without ever sending an adverse-action notice, so long as they did not obtain a new credit report for the policyholder or so long as the policyholder's credit score does not materially worsen. According to plaintiffs, defendants' test is under-inclusive. Therefore, plaintiffs urge that if the court accepts defendants' argument that a renewal increase must be "caused by" the insureds' FARA or FPRA factor, adverse action notices should be sent to any subsequent renewal customer with an increase in premium that was calculated using (a) a FARA or FPRA factor higher than that used in the prior policy or (b) a FARA or FPRA factor that is worse relative to the neutral FARA or FPRA factor than that used in the prior policy.

To illustrate, plaintiffs assert that if a policyholder had a FARA factor of .50 in one policy for an "L" FARA code, but a FARA factor of .75 in the next policy period for the same "L" FARA code, that policyholder would be entitled to notice of an adverse action. Similarly, plaintiffs assert that if a policyholder had a FARA factor that was ten percent higher than the neutral FARA factor in one policy period, but a FARA factor that was twenty percent higher than the neutral in the next (even if the FARA code had not changed), that policyholder would likewise be entitled to notice of adverse action. Use of these two tests, plaintiffs argue, will ensure that adverse action notices are sent whenever the impact of defendants' credit scoring program on a policyholder's premium has an adverse effect.

Defendants argue that plaintiffs' two-part alternative test for the subsequent renewals is wrong. Defendants assert that plaintiffs' first test would include any insured who had a higher FARA or FPRA factor than was used during a prior policy period. But this is over-inclusive, defendants argue, because it would result in a finding of adverse action based upon a classification change that has nothing to do with an insured's credit report or a credit-based insurance score. Moreover, defendants contend that this test would require defendants to send a FCRA notice to those with the best rates (if it reduced the discount for FARA code "A" from .80 to .85) and such result is contrary to *Safeco*. Plaintiffs' second test is wrong, defendants argue, because comparing an insured's FARA or FPRA factor at a subsequent renewal to the average FARA or FPRA factor at renewal would have nothing to do with the insured's individual credit report and its impact on the premium. Defendants contend that unlike the first time a FARA or FPRA factor is applied to an insured's renewal policy at transition renewal, any global changes to FARA or FPRA factors at subsequent renewals that changed the average FARA or FPRA factor would constitute classification changes unrelated to an individual insured's credit report. Defendants however assert that under plaintiffs' second test, adverse action would be based upon how an insurer treats other insureds using credit report information—not how the insured's credit report impacts his or her premium. Defendants argue that if *Safeco* means anything, it means that only premium increases due to an insured's credit report constitute adverse action and premium increases due to other causes do not.

The court, upon review, concludes that defendants' position in regard to subsequent renewals comports with *Safeco*. Thus, the court finds that three conditions must be met for a renewal premium increase to have been caused by an insured's FARA or FPRA factor at subsequent renewal: (1) the insured's premium must have increased over the prior renewal premium charge; (2) the increase must have been accompanied by a worsening of the insured's credit-based insurance score; and (3) the lower credit-based insurance score must have caused a negative change in the insured's FARA or FPRA factor discount. In other words, the renewal premium increase at subsequent renewal must be caused, in whole or in part, by a negative change in the policyholder's credit-based insurance score that resulted in the application of a lower FARA or FPRA factor discount than was used to rate the policy in the immediately previous policy period.

### (iii). *Commencement Dates for Plaintiffs' Claims*

Defendants contend that they cannot be liable for any FCRA notice violations that occurred more than two years before the filing of the *Corl, Watts* and *Mobbs* complaints. *See*, 15 U.S.C. § 1681p (2000) (statute of limitations for a FCRA violation is "two years from the date on which the liability arises"). And relying upon the court's ruling in *In re Farmers Ins. Co. FCRA Litig. ("Braxton")*, Case No. CIV–03–158–F, 2007 WL 4215833 (W.D.Okla. Nov. 29, 2007), defendants contend that any FCRA violation occurred, if at all, when defendants billed their insureds for a premium that constituted an adverse action without providing a sufficient notice under § 1681m(a).

According to defendants, claims against FIE, FIRE and FICI by homeowners insureds must be based on premium charges occurring on or after February 12, 2001, two years from the filing date of the *Watts* complaint, or on or after February 6, 2001, for Oklahoma FICI homeowner insureds based on the filing date of the *Mobbs* complaint. Defendants assert that claims against FICI by automobile insureds must be based on premium charges occurring on or after June 13, 2001, two years from the filing date of the *Corl* complaint. Defendants further contend that claims against other defendant insurance carriers (*i.e.* Mid–Century), claims on behalf of other insureds (*i.e.* FIE and Mid–Century automobile insureds) [8] and claims based on premium charges billed more than two years before the referenced filing dates are time-barred.

Plaintiffs argue that defendants' limitations argument ignores the class action tolling doctrine of *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) and its progeny. Plaintiffs assert that beginning on September 28, 2001 with the *Ashby* complaint against FGI, several overlapping putative class actions were filed against FGI and associated entities in the Farmers family. The series of class actions was continuous, plaintiffs assert, and with the exception of the *Ashby* lawsuit, the class actions came to this court. Plaintiffs contend that the effect of the class action lawsuits has been to toll the applicable two-year limitations period for the plaintiffs and the putative class members in the *Corl, Watts* and *Mobbs* cases. Plaintiffs

---

8. Defendants contend that the January 24, 2005 amendments to the *Corl, Watts* and *Mobbs'* complaints do not preserve any claims against FIE or Mid–Century automobile insureds because the class period ended more than two years before the date of these amendments.

assert that the Supreme Court has held that "commencement of a class action suspends the applicable statute of limitations as to *all asserted members of the class* who would have been parties had the suit been permitted to continue as a class action." *American Pipe & Constr. Co.,* 414 U.S. at 554, 94 S.Ct. 756 (emphasis added); *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 354, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) ("Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.") Although plaintiffs acknowledge that the Supreme Court has not explicitly addressed the application of the *American Pipe* tolling doctrine to later-filed class actions (as opposed to later-filed individual actions), plaintiffs contend that the reasoning of *American Pipe* suggests that it would apply to later-filed class actions. Plaintiffs assert that two circuits and several districts courts have so concluded. In addition, plaintiffs assert that applying tolling to subsequently filed class actions is also required by the expansive view of *American Pipe* to which the Tenth Circuit has adhered. Plaintiffs contend that the tolling principles of *American Pipe* mean that plaintiffs' claims are timely.

Specifically, on this point, plaintiffs contend that the filing of the *Ashby* class action operated to toll the statute of limitations as to all claims against FGI arising out of adverse action notices sent on behalf of any affiliated company beginning September 28, 2001. This includes the claims of plaintiffs and all persons who purchased policies from FGI's affiliated companies, including FICI, FIE, FIRE and Mid–Century. Thus, plaintiffs assert that any claims of policyholders of FICI, FIE, FIRE and Mid–Century against FGI for

adverse actions arising on or before September 28, 1999 are timely.

Beyond the *Ashby* case, plaintiffs contend that the *Clark* class action against FGI and FIE tolled the limitations period against these defendants as of July 15, 2002. Plaintiffs additionally assert that as against FGI, the limitations period was tolled as of July 15, 2002 as to policyholders not only of FIE but also by policyholders of Mid–Century and FICI in light of the *Clark* complaint's references to FIE's subsidiaries. Thus, plaintiffs assert that claims against FGI (for policyholders of FIE, Mid–Century and FICI) and claims against FIE arising from adverse actions taken on or after July 15, 2000 are timely.

As to FICI, plaintiffs assert that the claims against FICI arising from adverse actions taken (a) on or after February 6, 2001 for Oklahoma homeowners; (b) on or after February 12, 2001 for non-Oklahoma homeowners; and (c) on or after June 1, 2001 for automobile policies are timely.

In regard to Mid–Century, plaintiffs state that Mid–Century was named as a defendant in the *Ross* class action on October 27, 2003 and therefore claims against Mid–Century for adverse actions taken on or after October 27, 2001 are timely.

Defendants argue that *American Pipe* and its progeny plainly intended to create class action tolling for subsequent individual actions by former class members after class certification has been denied. These cases do not, defendants argue, to allow class members to file subsequent class actions. Defendants assert that the majority of circuits (First, Second, Sixth, Ninth [9] and Eleventh) addressing the issue have held that the tolling doctrine cannot be extended to subsequent class actions. Defendants acknowledge that two circuits

---

9. Defendants rely upon *Robbin v. Fluor Corp.,* 835 F.2d 213 (9th Cir.1987) but note that the

Ninth Circuit later distinguished *Robbin* and allowed tolling in a subsequent class action.

(Third and Ninth) have permitted tolling for subsequent class actions. However, these circuits, defendants argue, did so in limited circumstances that are not applicable to the case at bar. Defendants assert that the Tenth Circuit has not applied *American Pipe* as broadly as plaintiffs assert and that no Tenth Circuit case addresses the critical question of whether the tolling doctrine applies to later-filed class actions. In addition, defendants contend that the judicial efficiencies the Supreme Court sought to create with *American Pipe* would not be furthered by subsequent class action tolling. According to defendants, if plaintiffs' position were adopted, it would encourage the filing of class action complaints with intentionally overbroad, over-inclusive and vague class definitions so that when the court ultimately narrows the class definition to the appropriate scope that should have been pleaded in the first instance, putative class members could claim the statute of limitations has been tolled in the interim. Defendants contend that allowing plaintiffs to piggyback onto the *Ashby* and *Clark* complaints would foster judicial inefficiency. Defendants point out that under plaintiffs' theory, at the time the *Corl, Watts* and *Mobbs* complaints were filed, the plaintiffs and the putative class were members of at least two and possibly three class actions. Defendants contend that the inefficiencies inherent in having multiple class action lawsuits that include the same class members proceeding in different jurisdictions cannot be supported by the rationale of *American Pipe*. Even if the court were to conclude that the *American Pipe* tolling doctrine should be applied, defendants contend that plaintiffs and the members of the putative class are not "asserted members of the class" in *Ashby*. The *Ashby* putative class was defined as "all purchasers of automobile insurance, homeowner's insurance and landlord protection insurance

from defendant's [FGI] subsidiaries from March 2000 to date." Although the *Ashby* court interpreted the term "subsidiaries" to include "affiliates" of FGI, *see, Ashby v. Farmers Ins. Co. of Oregon,* 565 F.Supp.2d 1188, 1195 (D.Or.2008), defendants contend that the court's ruling is not as broad as plaintiffs suggest. Defendants assert that the court gave no indication that its ruling was intended to extend to affiliates other than Farmers Insurance Company of Oregon ("FICO"). Instead, defendants assert that the *Ashby* court concluded that although the original complaint misidentified FGI as the issuer of plaintiffs' insurance policies, FGI had sufficient notice that plaintiffs sought to represent a class of FICO insureds because FGI knew that the class of insureds, located in Oregon, were FICO insureds. In other words, since Mr. Ashby was a FICO insured, FGI was put on notice that the putative class members were FICO insureds. Defendants contend that the same cannot be said for the plaintiffs in this case. Defendants maintain that it would be unreasonable to anticipate that FGI reasonably would have interpreted the *Ashby* complaint to include plaintiffs in this case and the other members of plaintiffs' proposed class. In addition, defendants contend that the fact that the *Ashby* plaintiffs ultimately narrowed the class definition and sought certification of an Oregon-only class of FICO insureds establishes that none of the plaintiffs in this case or the broad class they seek to represent can be considered "asserted members" of the earlier class.

In addition, defendants contend that plaintiffs and the putative class are not "asserted members of the class" in *Clark*. Defendants assert that the claims alleged against FGI and FIE in *Clark* were entirely different from and inconsistent with the claims advanced in this litigation. Defendants contend that the putative class was

defined to include all insureds or applicants for property or casualty insurance with FGI and FIE subsidiaries who were "advised" by defendants that they were either: "(1) rejected for an insurance policy; (2) transferred to another Farmers' subsidiary at a higher premium; (3) charged a higher premium with the same Farmers' subsidiary; or (4) were required to pay additional up-front premiums, and who received no contemporaneous notice from defendants of such adverse action." *See,* Class Action Complaint (doc. no. 318). Defendants assert that no one in the putative class in the *Corl, Watts* or *Mobbs* cases claims that they were advised they were charged higher premiums or that they did not receive any FCRA notice. Rather, defendants contend that the putative class alleges the opposite—they were not advised that they were charged a higher premium and they did, in fact, receive a FCRA notice but it failed to advise them of the adverse action taken. Defendants further contend that even Mr. Clark has admitted that his complaint asserted wholly different allegations than those alleged in the present action and has also acknowledged that he is not a member of the putative class in *Corl, Watts* and *Mobbs.*

Plaintiffs counter that although defendants now contend it would be unreasonable for FGI to anticipate that the class in *Ashby* included any of the proposed class members in *Corl, Watts* and *Mobbs*, FGI, in fact, acknowledged to the court in the *Ashby* case that the case involved a nationwide class action. Specifically, plaintiffs point out that FGI, in opposition to the *Ashby* plaintiffs' motion for certification, represented to the court that the *Ashby* plaintiffs sought to represent a nationwide class that included millions of policy buyers and that this nationwide class presumably included individuals insured by the insuring entities that utilized the federally registered service mark The Farmers In-

surance Group of Companies. Plaintiffs state that each plaintiff and each class member in the *Corl, Watts* and *Mobbs* cases was insured by one of the insuring entities that utilize the federally registered service mark The Farmers Insurance Group of Companies. In addition, plaintiffs contend that the subsequent narrowing of the *Ashby* class to include Oregon-only FICO insureds does not preclude tolling. According to plaintiffs, the cases cited by defendants are distinguishable. Plaintiffs contend that regardless of whether a broad class definition is subsequently narrowed, a claimant who was within that broad definition is entitled to the *American Pipe* tolling until the class is limited. Consequently, plaintiffs contend that the *American Pipe* tolling continued until the actual narrowing of the *Ashby* class, which occurred in May 2003, less than two years before the filing in the *Corl, Watts* and *Mobbs* cases and the filing of the Consolidated and Amended Class Action Complaint.

Plaintiffs also contend that they were asserted to be members of the class in the *Clark* case. Plaintiffs contend that the pleadings of the *Clark* plaintiff, as well as the motion for class certification in that case, focused on the adequacy of defendants' FCRA notices and whether those notices actually informed insureds that adverse action had been taken. As in *Ashby,* defendants knew that the *Clark* case sought certification of a nationwide class. In addition, plaintiffs assert that the *Clark* plaintiff did not admit that his allegations were wholly different from the allegations in *Corl, Watts* and *Mobbs*. According to plaintiffs, Mr. Clark merely stated that he was not a member of the class certified in those cases because he was insured by two Farmers entities that were not referenced in the *Corl, Watts* and *Mobbs* class definition. Plaintiffs also point out that the

*Clark* class definition was broader than the *Corl, Watts* and *Mobbs* class definitions.

██ Upon careful consideration of the parties' arguments and the applicable law, the court concludes that the *American Pipe* tolling rule should be applied and that the applicable limitations period commenced against FGI and the other defendants as urged by plaintiffs. The court acknowledges that the majority of circuit courts have concluded that the statute of limitations should not be tolled in the successive class action context [10] and that the Tenth Circuit has not addressed the issue. However, two circuits, the Third and Ninth Circuits, have permitted tolling in this context. The court concludes that in the circumstances presented in this case, the statute of limitations should be tolled. Like the plaintiffs in *Catholic Social Services, Inc. v. I.N.S.*, 232 F.3d 1139 (9th Cir.2000) and *Yang v. Odom*, 392 F.3d 97 (3rd Cir.2004), *cert. denied*, 544 U.S. 1048, 125 S.Ct. 2294, 161 L.Ed.2d 1088 (2005), plaintiffs in this MDL proceeding are not attempting to re-litigate an earlier denial of class certification based upon deficiencies of the would-be class, and are in a different posture from the plaintiffs in the cases cited by defendants in which tolling for the subsequent class actions was not allowed. The concerns about repose, inefficiency and wasteful litigation expressed by the majority of circuit courts in denying

tolling are inapposite where there has never been a definitive determination on class certification. As stated by the Third Circuit in *Yang*, the court concludes that

> [g]iven that *American Pipe* tolling would unquestionably apply were the plaintiffs here to bring individual actions, it would be at odds with the policy undergirding the class action device, as stated by the Supreme Court, to deny plaintiffs the benefit of tolling, and thus [deny them] the class action mechanism, when no defect in the class itself has been shown.

*Yang*, 392 F.3d at 106. While the *Corl, Watts* and *Mobbs* cases were filed before a class certification decision in *Ashby* and *Clark*, the court notes that the Tenth Circuit has concluded that in regard to individual suits, *American Pipe* tolling nonetheless applies. *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1230–1232 (10th Cir.2008). The court concludes that the same should apply in the subsequent class action context.

The court concludes that plaintiffs and the putative class members were asserted members of the class in *Ashby*. The record sufficiently demonstrates that *Ashby* involved a nationwide class that included plaintiffs and the putative class members. It also reveals that defendant FGI acknowledged that *Ashby* was a nationwide class action including "individuals insured

---

10. *Basch v. Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir.1998) ("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely. Permitting such tactics would allow lawyers to file successive putative class actions with the hope of attracting more potential plaintiffs and perpetually tolling the statute of limitations as to all such potential litigants[.]"); *Korwek v. Hunt*, 827 F.2d 874, 879 (2nd Cir. 1987) (class action tolls statute of limitations only for subsequent individual actions, not for subsequent class action alleging similar class and similar claims); *Salazar–Calderon v. Pre-*

*sidio Valley Farmers Ass'n*, 765 F.2d 1334, 1351 (5th Cir.1985) (refusing to "piggyback one class action onto another and thus toll the statute of limitations indefinitely"); *Andrews v. Orr*, 851 F.2d 146, 148–49 (6th Cir.1988) (limiting *American Pipe* to individual claims); *Robbin v. Fluor Corp.*, 835 F.2d 213 (9th Cir.1987) (not applying *American Pipe* tolling to subsequent class action after class certification was denied and case was voluntarily dismissed and re-filed with same allegations); *Griffin v. Singletary*, 17 F.3d 356, 359–60 (11th Cir.1994) (not applying *American Pipe* to subsequent class action).

by insuring entities that utilize the federally registered service mark The Farmers Insurance Group of Companies." *See,* Ex. 17 to Plaintiffs' Reply in Support of Their Cross–Motion for Partial Summary Judgment (doc. no. 959). Because (i) defendant FGI believed that *Ashby* was a nationwide class including individuals insured by the insuring entities utilizing the Farmers registered service mark and (ii) the plaintiffs and the putative class members fall within that nationwide class, the court concludes that plaintiffs were putative members of the class in *Ashby.* The court agrees with plaintiffs that the subsequent narrowing of the class almost two years later (and apparently not by virtue of a settlement) did not preclude tolling. The *American Pipe* tolling continued until the nationwide class was narrowed in May 2003, less than two years prior to the filing of the *Corl* action [11] and the Consolidated and Amended Class Action Complaint.

The court likewise concludes that plaintiffs are asserted members of the class in *Clark.* The court is satisfied by the pleadings and other papers filed in the *Clark* case that *Clark* involved claims similar to those alleged in *Corl, Mobbs* and *Watts.*

■ In footnote 10 of their reply brief, defendants argue that even if the court disagrees with defendants and finds that the filing of the *Clark* complaint tolls the statute of limitations on the claims against FGI, that complaint cannot be used to toll the limitations period on the claims against FIE. According to defendants, Mr. Clark was not an FIE insured and therefore did not have standing to assert any claims against FIE. Because he lacked standing to assert claims against FIE, the statute of limitations cannot be tolled pursuant to *American Pipe.* Plaintiffs, in a response

footnote, argue that no finding has ever been made that Mr. Clark lacked standing to sue FIE and that defendants have not presented any competent evidence to show that FIE took no action with respect to Mr. Clark's policy. Therefore, plaintiffs contend that summary judgment based on this point would be improper.

The court agrees. The court concludes that defendants have failed to show as a matter of law that Mr. Clark did not have standing to sue FIE. The court therefore concludes that defendants are not entitled to summary judgment on the statute of limitations issue as to claims against FIE.

Defendants have not challenged whether any of the plaintiffs or the putative class members would be asserted members of the *Ross* action. The court concludes that the *Ross* action also tolled the claims against Mid–Century.

(iv). *Plaintiffs' Claims Against Defendants*

Applying the foregoing analysis as to new-business insureds, the renewal insureds and the commencement dates for plaintiffs' claims, the court finds, as discussed below, that defendants are entitled to summary judgment, as requested in their motion, as to the FCRA claims of plaintiffs Nyle Cearlock, Arlene Hancock and Cynthia L. Hodnett. The court finds that defendants are entitled to partial summary judgment only regarding certain FCRA claims of plaintiffs Harry Corl and David L. Watts, Jr. as hereinafter discussed.

(a). *Nyle Cearlock*

Plaintiff Cearlock alleges FCRA claims against FICI and FGI relating to renewal

---

**11.** The *Watts* and *Mobbs* cases were already filed by the time the class was narrowed in *Ashby.*

premiums for two automobile policies (Nos. 154175002 and 154175001) and one homeowners policy (No. 919127587).

■ The court concludes that defendants did not take adverse action against plaintiff Cearlock at the transition renewals of his automobile policies on March 10, 2001. At the time of these transition renewals, the record reveals that plaintiff Cearlock's premium charges were calculated using a FARA code "G" and a corresponding FARA factor of .95. Although the premium charges for both policies had increased, the record reveals that no adverse action occurred because the FARA code "G" actually reduced plaintiff Cearlock's premium by 1.3 percent. The premium increases for the automobile policies were therefore not caused by the FARA factor. *See*, Appendix A: Adverse Action Analysis for Named Plaintiffs ("Appendix A"), Defendants' Motion for Summary Judgment (doc. no. 945).

■ The court also concludes that defendants did not take adverse action against plaintiff Cearlock at the subsequent renewals of his automobile policies. For policy no. 154175002, the premium charges decreased at subsequent renewals on September 10, 2001 and March 10, 2002 and on September 10, 2002, the FARA code and FARA factor remained unchanged from the previous policy period. For policy no. 154175001, the FARA code stayed the same and the discount increased at subsequent renewal on September 10, 2001 and September 10, 2002, and on September 10, 2002, the premium charge decreased. *See*, Appendix A (doc. no. 945).

■ As to the homeowners policy, the court concludes that defendants did not take adverse action against plaintiff Cear-

lock at transition renewal on September 10, 2002. For this renewal, plaintiff Cearlock's premium was calculated using the FPRA code of "C" and the FPRA factor of .55. FARA code "C" was the best discount. Therefore, defendants did not take adverse action against plaintiff Cearlock at the transition renewal of his homeowners policy. *See*, Appendix A (doc. no. 945).

Because defendants did not take adverse action against plaintiff Cearlock at the transition and subsequent renewals of his two automobile policies or at the transition renewal of his homeowners policy, the court concludes that no adverse-action notice was required to be sent at those renewals and defendants are entitled to summary judgment as to the FCRA claims of plaintiff Cearlock.

(b). *Arlene Hancock*

Plaintiff Hancock asserts FCRA claims against FICI and FGI relating to the renewal premiums of two automobile policies (Nos. 132473892 and 152555285).

■ The court concludes that defendants did not take adverse action against plaintiff Hancock at transition renewals of her automobile policies on April 4, 2001 and April 27, 2001. At the time of those renewals, plaintiff Hancock's premium charges decreased. *See*, Appendix A (doc. 945).

■ The court also concludes that defendants did not take adverse action against plaintiff Hancock on the subsequent renewals of her automobile policies. For policy number 132473892, the FARA code remained the same from the previous policy period and the discount increased at subsequent renewals on October 4, 2001 and April 4, 2002. For policy number

152555285, the premium charges decreased at subsequent renewals on October 27, 2001 and April 27, 2002, and on October 27, 2002, the FARA code and FARA factor stayed the same from the previous policy period. Therefore, to the extent the premiums increased at subsequent renewals, the FARA factors did not cause the increase. *See,* Appendix A (doc. 945).

Because defendants did not take adverse action against plaintiff Hancock at the transition and subsequent renewals of her automobile policies, the court concludes that no adverse-action notice was required to be sent at those renewals and defendants are entitled to summary judgment as to the FCRA claims of plaintiff Hancock.

(c). *Cynthia L. Hodnett*

Plaintiff Hodnett alleges FCRA claims against FICI and FGI relating to renewal premiums of an automobile policy (No. 146331273) and a homeowners policy (No. 919499016).

■ The court concludes that defendants did not take adverse action against plaintiff Hodnett at transition renewal of her automobile policy. Although the premium was originally calculated using a FARA code "L" and a FARA factor of 1.0 (the worst discount), defendants revised the premium charge utilizing a FARA code "F" and a FARA factor of .95. The new FARA code and FARA factor reduced plaintiff Hancock's premium by 1.3 percent. The increased premium at transition renewal was not caused by the FARA factor. *See,* Appendix A (doc. 945).

■ The court finds that defendants did not take adverse action against plaintiff Hodnett at the subsequent renewals of her automobile policy. Plaintiff Hodnett's premium charge decreased at subsequent renewal on November 9, 2001, and on June 11, 2002, the FARA code stayed the same from the previous policy period and the discount increased. *See,* Appendix A (doc. 945).

■ As for the homeowners policy, the court concludes that defendants did not take adverse action against plaintiff Hodnett at transition renewal. Although the premium charge increased, defendants utilized FPRA code "G" and FPRA factor .67 which actually reduced plaintiff Hodnett's premium by 7.8 percent. The increase in premium was not caused by the FPRA factor. *See,* Appendix A (doc. 945).

Because defendants did not take adverse action against plaintiff Hodnett at the renewals of her automobile and homeowners policies, the court finds that no adverse-action notice was required to be sent to plaintiff Hodnett and defendants are entitled to summary judgment on the FCRA claims of plaintiff Hodnett.

(d). *Harry Corl*

Plaintiff Corl alleges FCRA claims against FICI and FGI relating to renewals of two automobile policies (Nos. 150540106 and 146290921) and one homeowners policy (No. 914473793).

Defendants concede that plaintiff Corl's claim against FICI is timely and that FICI took adverse action against plaintiff Corl at the transition renewal of his automobile policy (No. 146290921) on September 26, 2001 and at the transition renewal of his homeowners policy (No. 914473793) on May 7, 2002. The court concludes that plaintiff Corl may proceed as to these claims against FICI. The court also concludes, as hereinafter discussed, plaintiff

Corl may proceed as to his claims against FGI relating to these transition renewals.

Despite defendants' arguments to the contrary, the court concludes that defendants are not entitled to summary judgment on plaintiff Corl's claim against FGI with respect to the transition renewal of his automobile policy (No. 150540106) on March 2, 2001. The court concludes that the claim is not time-barred because the adverse action was taken after September 28, 1999.

 The court concludes that defendants are entitled to partial summary judgment as to plaintiff Corl's claims on the subsequent renewals of his automobile policy (No. 150540106) on September 26, 2001, March 26, 2002, September 26, 2002. The FARA code stayed the same and the discount increased at the subsequent renewal on September 26, 2001. The premium charge did not increase from the previous policy period at the subsequent renewal on March 26, 2002. The premium charge decreased from the previous policy period at the subsequent renewal on September 26, 2002. *See,* Appendix A (doc. 945).

 The court concludes that defendants are entitled to partial summary judgment as to plaintiff Corl's claims on the subsequent renewals of his automobile policy (No. 146290921). There was no premium charge increase at the subsequent renewal on March 26, 2002, and on September 26, 2002, the FARA code remained the same from the previous policy period and the discount increased. *See,* Appendix A (doc. 945).

Because defendants did not take adverse action against plaintiff Corl at the subsequent renewals of his automobile policies,

the court finds that defendants are entitled to partial summary judgment as to the FCRA claims of plaintiff Corl relating to the subsequent renewals. The other FCRA claims of plaintiff Corl relating to the transition renewals of his automobile policies and his homeowners policy may proceed against defendants.

(e). *David L. Watts, Jr.*

Plaintiff Watts alleges claims against FICI, FIE, Mid–Century and FGI relating to new-business and renewal premiums for his automobile and homeowners policies.

Defendants concede that FICI took adverse action on a premium charge for plaintiff Watts' automobile policy (No. 122067280) at transition renewal on June 27, 2001 and that FIE took adverse action on a premium charge for plaintiff Watts' homeowners policy (No. 917108300) at transition renewal on April 30, 2001. The court therefore finds that plaintiff Watts may proceed as to his claims against FICI and FIE relating to the transition renewals of those policies. The court also finds, as will be discussed, that plaintiff Watts may also proceed against FGI on those claims.

The court concludes that defendants are entitled to partial summary judgment on the subsequent renewals for the automobile policy (No. 122067280). At the subsequent renewal on December 27, 2001, the FARA code stayed the same and the discount increased. At the subsequent renewal on June 27, 2002, the premium charge decreased. *See,* Appendix A (doc. 945). Therefore, defendants did not take adverse action against plaintiff Watts on these subsequent renewals.

Contrary to defendants' arguments, the court finds that defendants are not entitled

to partial summary judgment as to the claim against FGI related to the transition renewal of the automobile policy (No. 103248080) on April 14, 2001. The court, as will be discussed, concludes that this claim may proceed against FGI. The court also finds that this claim is not time-barred, because the adverse action occurred after September 28, 1999.

The court also concludes that defendants are not entitled to partial summary judgment as to the new-business premiums for the homeowners policies (Nos. 918794516 and 923720508), the transaction dates being August 31, 2001 and August 31, 2002. The record does not reflect that the premium charges were lower than or equal to the charges using the premium weighted average FPRA factor.

The court concludes that defendants are not entitled to partial summary judgment as to claim regarding the new-business premium for the automobile policy (No. 154944718), the transaction date being December 20, 2001. The record does not reflect that the charge was lower than or equal to the charge using the premium weighted average FPRA factor.

The court concludes, however, that defendants are entitled to partial summary judgment as to the claim regarding the subsequent renewal premium for the automobile policy (No. 154944718) on June 20, 2002. The court concludes that no adverse action occurred because the FARA code and FARA factor stayed the same. *See*, Appendix A (doc. 945).

The court finds that defendants are not entitled to partial summary judgment as to the claim relating to the transition renewal of automobile policy (No. 154944621) and the claim relating to the subsequent renewal of that policy. The claims against Mid–Century are not time-barred, because the adverse actions occurred after October 27, 2001. The claims against FGI, as discussed below, may proceed. The claims against FGI are likewise not time-barred as the adverse actions occurred after September 28, 1999.

Because the court finds that defendants did not take adverse action as to the subsequent renewals for the automobile policy (No. 122067280) and the subsequent renewal for the automobile policy (No. 154944718), the court concludes that defendants are entitled to partial summary judgment on plaintiff Watts' claims relating to those subsequent renewals. The other claims of plaintiff Watts may proceed against defendants.

B. *Verbal Notice of Adverse Action*

Defendants argue that they are not liable to plaintiff Watts on his FCRA claims in regard to the premium increase at transition renewal of his homeowners policy (No. 917108300) on April 30, 2001 because defendants' insurance agent orally informed plaintiff Watts as to how his credit report affected his premiums.[12] Defendants contend that section 1681m(a) states that a user may provide notice of adverse action orally, in writing, or electronically. According to defendants, Congress stated three times in § 1681m(a)

12. In their motion, defendants also argue that they are not liable to plaintiff Cearlock because defendants' insurance agent orally informed plaintiff Cearlock of how his credit report impacted his premiums. The court need not address this argument in light of the court's finding that defendants did not take adverse action against plaintiff Cearlock in regard to his automobile and homeowners policies.

that the disclosures required by that section could be communicated orally to the insureds. Defendants assert that Congress did not require that all the disclosures be communicated at the same time or by the same medium. Rather, defendants assert that each subparagraph of § 1681m(a) contains different disclosure requirements and provides that the information may be separately provided orally, in writing, or electronically. Defendants contend that had Congress intended to preclude separate communication of the information required by § 1681m(a), it would have so stated.

Defendants point out that plaintiff Watts contacted his insurance agent who informed him that his homeowners policy premium was high because of his credit report and explained to him how his FPRA code compared with other FPRA codes on the scale from A to Z. According to defendants, this conversation occurred in or around April 2001—the same time plaintiff Watts' renewal homeowners premium was set for the first time ("transition renewal") using a FPRA code "G." Thus, defendants contend that at the time they took "adverse action" on plaintiff Watts' homeowners' policy, he was notified by his insurance agent that his premium was "high" because of his credit report and the corresponding FPRA code. Defendants assert that after the discussion with his insurance agent, plaintiff Watts obtained a copy of his credit report, found errors and made corrections. Thus, defendants contend that plaintiff Watts was provided notice of adverse action in regard to the increase of his homeowners policy premium and that, consequently, they are entitled to summary judgment on that claim.

The court concludes that defendants are not entitled to summary judgment as to

plaintiff Watts' FCRA claim. According to Mr. Watts, the conversation he had with his agent occurred in August 2002. *See,* Ex. 7 to Snider Decl., Watts' Deposition, pp. 18–19.[13] The adverse action at issue, according to defendants, occurred in April of 2001. The court need not decide whether written notice of adverse action may be supplemented by oral notice of adverse action, nor is it necessary to decide when oral notice of the adverse action must be given, *i.e.* whether oral notice of the adverse action must be given substantially contemporaneously with the adverse action. *See, Carroll v. Exxon Co., U.S.A.,* 434 F.Supp. 557, 559 (E.D.La.1977) ("The language of 15 U.S.C. § 1681m(a) clearly requires such disclosure contemporaneously upon notification of [an adverse action].") Even assuming that written notice of adverse action can be supplemented by oral notice of adverse action and that the supplementing oral notice of adverse action does not have to be provided contemporaneously or immediately after the adverse action, the court cannot conclude, as a matter of law, that the insurance agent's purported oral notice—which the court must at this juncture assume was given more than a year after the adverse action—sufficiently complied with the requirements of § 1681m(a). The court therefore concludes that defendants are not entitled to summary judgment as to plaintiff Watts' FCRA claim relating to the premium increase at the transition renewal of his homeowners policy (No. 917108300) on April 30, 2001, based upon the purported oral notification of adverse action.

## C. *Recovery of Statutory Damages— New–Business Insureds*

 As previously stated, plaintiffs seek to recover statutory damages against

---

**13.** The court views the evidence in a light most favorable to the non-moving party,

plaintiff Watts. *Adickes,* 398 U.S. at 157, 90 S.Ct. 1598.

defendants for failure to comply with the FCRA. To recover statutory damages, plaintiffs must prove that defendants willfully violated the FCRA. 15 U.S.C. § 1681n(a)(1)(A). Defendants contend that plaintiffs cannot do so with respect to the new-business insureds. Defendants point out that the Supreme Court in *Safeco* held that the insurer at issue did not willfully violate § 1681m(a) with respect to new-business insureds even though it failed to send any FCRA notices to them prior to the *Safeco* ruling. The Supreme Court concluded that such conduct fell "well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability." *Safeco*, 551 U.S. at 69, 127 S.Ct. 2201. According to defendants, the district court in the *Ashby* case, following *Safeco*, granted summary judgment to defendants against new-business insureds, holding that defendants' failure to send a sufficient written FCRA notice to insureds could not constitute a willful violation of the FCRA. Defendants urge the court to do the same with the new-business insureds, including plaintiff Watts, in this case. They contend that their decision to provide an FCRA notice to new-business insureds—even if that notice is found to lack certain language now held to be required by § 1681m(a)—cannot be deemed a willful violation of the FCRA when the decision of the insurer in *Safeco* to send no notice to new-business insureds, no matter how much it charged them, was found to be "not unreasonable." Therefore, the defendants contend that they are entitled to summary judgment on the claims of plaintiff Watts to the extent he bases his FCRA notice violation claim on any new-business premium charges.

Plaintiffs, in response, contend that the *Safeco* holding was based on the fact that the insurer at issue did not give the new-business insured any adverse-action notice "because it thought § 1681m(a) did not apply to initial applications." *Safeco*, 551 U.S. at 68, 127 S.Ct. 2201. The insurer had come to that conclusion based upon its rationale that the phrase "increase in any charge" for insurance as used in the definition of "adverse action" under § 1681a(k)(1)(b)(i) "presupposes prior dealing." *Id.* Plaintiffs assert that in this case, defendants never thought § 1681m(a) would never apply to initial applications. To the contrary, plaintiffs argue, defendants always thought, knew and fully understood that new-business insureds were entitled to a proper adverse action notice. Plaintiffs contend that the defendants' knowledge and understanding of the law distinguishes this case from *Safeco*. Plaintiffs assert that defendants cannot avoid liability for a willful violation if the evidence shows that they knew what the law required. Plaintiffs assert that the evidence shows that defendants knew that they were obligated to send adverse-action notices to new-business insureds and that despite that understanding, they either knowingly or recklessly disregarded the FCRA's obvious requirement to provide notices that pointed out the adverse action. Finally, plaintiffs contend that the *Ashby* ruling should not dictate the ruling in this case. According to plaintiffs, it is not clear that the *Ashby* court fully appreciated from the record defendants' understanding of their obligations to new-business insureds or their practices in providing notice to such insureds. Plaintiffs further contend that it is not clear that the record made any distinction between claims of "knowing" violations and claims of "reckless" violations.

Defendants, in reply, assert that *Safeco* forecloses plaintiffs' argument. According to defendants, the *Safeco* plaintiffs, like the

plaintiffs here, argued that evidence of the insurer's subjective intent was relevant to whether the insurer willfully violated the FCRA. They specifically pointed out that the insurer was aware of Federal Trade Commission guidance contrary to the no-notice practice and that the insurer lied to the Oregon Department of Insurance by telling that agency that new-business insureds were sent FCRA notices when they were not. Defendants point out that the Supreme Court found plaintiffs' argument to be unsound and rejected it. Defendants also point out that the same argument was rejected by the *Ashby* court. Even though the *Ashby* plaintiffs knew that the new-business insureds were entitled to an FCRA notice, the court concluded that "the absence of a clearly established baseline for determining which new insureds must receive such notices necessarily precludes a jury finding that Defendants willfully violated FCRA's adverse-action notice requirements as to any particular new insured." *Ashby*, 565 F.Supp.2d at 1207.

The court, upon review, concludes that defendants are not entitled to summary judgment on the claims of plaintiff Watts to the extent he bases his FCRA notice claim on any new-business premium charges. The court has previously ruled that the adverse action notices at issue, including those sent to new-business insureds, did not comply with the requirements of § 1681m(a). The court has also concluded that the issue of willfulness is one for the jury. The court concludes that the *Safeco* decision does not warrant a finding as a matter of law that defendants could not have willfully violated the FCRA by failing to send to new-business insureds adverse-action notices in compliance with the statute. The facts and circumstances in *Safeco* are clearly distinguishable from this case.

The court also declines to follow the *Ashby* decision with respect to new-business insureds. The court does not agree that the absence of a clearly established baseline for determining which new insureds must receive adverse action notices precludes a jury finding that defendants willfully violated FCRA's adverse-action notice requirements as to any particular insured. The court concludes that the baseline is not a factor in determining whether defendant willfully violated the FCRA under the facts presented in this case. Plaintiff Watts, as to his claims relating to new-business premiums, does not allege that defendants failed to provide him adverse-action notice but that defendants failed to provide "adequate" adverse-action notice. There is no issue as to identification of those new insureds who were entitled to an FCRA notice—defendants sent adverse-action notices to all new-business insureds who did not receive the maximum FARA or FPRA discount. Rather, the issue is whether the content of adverse-action notices sent by defendants to new-business insureds complied with the FCRA. The court therefore concludes that the absence of a clearly established baseline does not preclude a jury finding that defendants willfully violated the FCRA by failing to provide adequate adverse-action notices to new-business insureds.

In the court's view, defendants are not, as a matter of law, absolved from liability to new-business insureds, such as plaintiff Watts, based upon the holding of *Safeco* or the ruling in *Ashby*. Therefore, the court concludes that the claims of plaintiff Watts based upon new-business premiums may proceed as alleged.

D. *FGI*

Defendants contend that FGI is entitled to summary judgment and should

be dismissed from this action because it did not take adverse action against any plaintiff or putative class member and therefore could not have violated § 1681m(a). Defendants assert that § 1681m(a) applies only to a person or entity that "takes" adverse action with respect to a consumer based, in whole or in part, on the consumer report information. Defendants maintain that FGI did not take adverse action against plaintiffs or the class members because FGI did not deny, cancel, increase the charge for, or make unfavorable changes with respect to insurance coverage. According to defendants, FGI is not an insurance company, does not sell insurance, and does not insure any policyholders. *See,* Declaration of Adam Morris, ¶ 2, Ex. 13 to Snider Decl. (doc. no. 947). Defendants assert that FGI does not own and has never owned any interest in FICI, FIE, FIRE or Mid–Century. *Id.* at ¶ 7. Defendants represent that FGI is an attorney-in-fact which provides non-claim services for Farmers insuring entities in exchange for a fee. *Id.* at ¶¶ 6–8. These services, according to defendants, include developing rate structures, reviewing applications for insurance, performing functions related to underwriting insured risks (*e.g.* determining the discount the insurer offers to insureds); compiling, printing, and mailing the insurers' policies to insureds, and collecting and crediting premium payments. *Id.* at ¶ 8. None of the tasks, defendants argue, are done in FGI's name or for its own account. Each activity, they maintain, is performed by FGI as an agent for a disclosed principal, in the name of and for the benefit of the insuring entity. *Id.* at ¶ 9. Because FGI is not an insurer and does not have the power to deny, cancel, increase the charge, or reduce the terms or amounts of coverage for an insured, defendants argue that it

cannot and did not take adverse action against any plaintiff or putative class member.

In a footnote, defendants also argue that the same argument applies to FUA. According to defendants, FUA is the attorney-in-fact for FIRE and is not itself an insurer and does not own any interest in FICI, FIE, FIRE or Mid–Century. Therefore, like FGI, defendants contend that FUA did not and cannot take adverse action against any named plaintiff or putative class member.

Plaintiffs, in response, contend that the decision to increase premiums for the policyholders in the various Farmers insurance companies based on information in their consumer credit reports was made by a single entity: FGI. They also assert that it was FGI that created and disseminated the defective FCRA notices at issue. Plaintiffs contend that defendants have already lost this issue on appeal in the *Ashby* case. They contend, on the basis of *stare decisis* and estoppel, that the result should be the same in this case. Plaintiffs contend that the plain language of § 1681m(a) does not apply only to "insurers" but applies broadly to "any person" that takes adverse action, which includes "an increase in any charge for ... or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance." *See,* 15 U.S.C. § 1681 a(k)(1)(B)(i). Plaintiffs contend that it is undisputed that FGI carried out all underwriting functions in connection with plaintiffs' insurance. Thus, plaintiffs contend that FGI did not merely participate in the adverse action decision; it alone made the adverse action decision after accessing plaintiffs' consumer information, and it performed all the

tasks necessary to accomplish the adverse action. Consequently, plaintiffs contend that, as a matter of law, FGI is jointly and severally liable with its affiliated companies for failing to issue adequate adverse-action notices.

Defendants reply that this court is not bound by another district court decision under the principles of *stare decisis,* nor is this court bound by a court of appeals decision in a different circuit. In addition, defendants assert that although § 1681m(a) does not reference "insurers," only insurers can take the adverse actions enumerated in the FCRA. Defendants contend that FGI could not and did not take any of the adverse actions itself against plaintiffs.

The court concludes that FGI is not entitled to summary judgment as to plaintiffs' claims.[14] The court, in its class certification decision, previously followed the Ninth Circuit's decision in *Reynolds v. Hartford Financial Services Group, Inc.,* 435 F.3d 1081 (9th Cir.2006), *rev'd on other grounds, Safeco,* 551 U.S. 47, 127 S.Ct. 2201 (2007), wherein the court held:

> [W]hen a consumer applies for insurance with a family of companies and is charged a higher rate for insurance because of his credit report, two or more companies within that family may be jointly and severally liable. The notice requirement applies to any company that makes a decision that a higher rate shall be imposed, issues a policy at a higher rate, or refuses to provide a policy at a lower rate, if the company's action is based in whole or in part on a consumer's credit information.

*Reynolds,* 435 F.3d at 1085. The *Safeco* decision did not affect this ruling. The court is not persuaded by defendants' additional arguments to revisit the court's decision to follow the *Reynolds'* decision. The court concludes that plaintiffs may proceed with their claims against FGI. The court concludes, like the court in *Ashby,* 565 F.Supp.2d at 1194, that FGI and the other Farmers entities may be held jointly and severally liable as affiliated companies for failing to send adequate adverse-action notices to new-business and renewal automobile and homeowners insureds.

### E. FIRE, FUA and Mid–Century

Defendants contend that plaintiffs' claims against FIRE, FUA and Mid–Century should be dismissed. First, defendants assert that no named plaintiff is an insured of FIRE. Because no named plaintiff is an insured of FIRE, defendants maintain that plaintiffs do not have standing to assert claims against FIRE. Moreover, because plaintiffs have no standing to sue FIRE, defendants contend that plaintiffs have no standing to sue FUA, FIRE's attorney-in-fact. In addition, defendants contend that although plaintiff Watts was an insured of Mid–Century, plaintiffs may not bring claims against Mid–Century because the claims are time-barred. According to defendants, Mid–Century was not added as a defendant until January 14, 2005. Defendants contend that by the time Mid–Century was added, any potential FCRA claims were already time-barred.

Plaintiffs, in response, concede that they do not have standing to sue FIRE based upon FIRE's independent wrongful con-

---

14. The court need not address defendants' argument in regard to FUA. As stated hereinafter, plaintiffs concede that the claims

against FUA may be dismissed for lack of standing.

duct. They also concede that the claims against FIRE and FUA may be dismissed. They do not concede, however, that they lack standing to prosecute claims possessed by FIRE insureds against FGI, which in its capacity as agent and management company for all Farmers entities (including FIRE), took adverse action against those insureds. As to Mid–Century, plaintiffs contend that the claims against it are not time-barred because the claims are tolled based on the filing of the *Ross* class action.

The court concludes that defendants are entitled to partial summary judgment as to the claims against FIRE and FUA. Plaintiffs have conceded that they do not have standing to bring claims against FIRE for its alleged independent wrongful conduct and have conceded that the claims against both FIRE and FUA may be dismissed.

■ On the basis of the *Reynolds* decision, 435 F.3d at 1085, previously followed by this court in this MDL proceeding, the court concludes that plaintiffs have standing to represent the insureds of FIRE as to injuries arising, at least in part, from the conduct of defendant FGI. *In re Farmers Ins. Co., Inc., FCRA Litigation*, 2006 WL 1042450 at *14 (W.D.Okla.2006). The court therefore concludes that defendants are not entitled to partial summary judgment as to these claims.

With respect to Mid–Century, the court concludes that the claims against Mid–Century are not time-barred based upon plaintiffs' failure to file any claims against Mid–Century prior to January 24, 2005. As previously stated, on October 27, 2003, Ellery H. Ross commenced a class action lawsuit in the Northern District of Alabama against Mid–Century for violation of the FCRA. *See,* Complaint (doc. no. 320).

The action was transferred to this court by the MDL panel. For the reasons previously stated, the court concludes that the statute of limitations against Mid–Century was tolled on October 27, 2003. The action was still pending when Mid–Century was included as a defendant in plaintiffs' Consolidated and Amended Class Action Complaint. Therefore, claims may be brought against Mid–Century as to any adverse action which occurred on or after October 27, 2001.

F. *Aggregating Statutory Damage Awards for Violations of § 1681m(a)*

■ Defendants argue that plaintiffs' class claims should be dismissed because aggregation of statutory damages awards should not be permitted under § 1681n(a)(1)(A) for a violation of § 1681m(a). According to defendants, Congress did not intend to authorize multi-billion-dollar aggregated statutory damages for an FCRA notice violation. Defendants contend that the court should interpret § 1681n(a)(1)(A) to bar plaintiffs from recovering aggregated statutory damages.

Plaintiffs, in response, assert that under the plain language of § 1681n(a)(1)(A), a defendant who willfully violates the FCRA is liable to each consumer for damages in the amount of $100 to $1,000. Plaintiffs assert that the statute does not prohibit or restrict class action suits. According to plaintiffs, the statute's silence is clear and unambiguous and cannot be construed to suggest that Congress did not intend to preclude plaintiffs from seeking statutory damages in a class action. Although the plain language of § 1681n should end the analysis, plaintiffs also contend that the history of the FCRA supports the conclusion that class actions are available for recovery of statutory damages for violation of § 1681m(a).

The court concludes that plaintiffs should not be precluded from seeking statutory damages under § 1681n(a)(1)(A) in a class action. In *Califano v. Yamasaki*, 442 U.S. 682, 700, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), the United States Supreme Court determined that class relief is available for any claim unless Congress expressly limits such relief. Specifically, the Court stated: "[i]n the absence of a direct expression by Congress of its intent to depart from the usual course of trying 'all suits of a civil nature' under the [Federal] Rules [of Civil Procedure] established for that purpose, class relief is appropriate in civil actions brought in federal court. . . .". Consequently, based upon *Califano*, class relief is available for all claims, including minimum statutory damage claims, assuming there is no clear expression of congressional intent to exempt the claims from Rule 23, Fed.R.Civ.P. *Id.* As plaintiffs have articulated, there is no express restriction of class relief for statutory damages under § 1681n. Thus, the court concludes that aggregation of statutory damages is permitted under § 1681n(a)(1)(A) for a violation of § 1681m(a) and defendants' argument to the contrary is rejected.

### G. *Facial Challenge to Statutory Damages Provision—Unconstitutionally Vague*

Defendants additionally contend that plaintiffs' class claims should be dismissed because § 1681n(a)(1)(A) is unconstitutionally vague. Defendants maintain that the statute provides no criteria at all for determining the amount of statutory damages between $100 and $1,000. Defendants assert that this court has previously observed that there are no objective criteria "other than throwing darts at a dart board to decide where [to] come out between a hundred and a thousand." *See,* Transcript of Motion to Bifurcate, p. 57, ll. 5–8, Ex. 20 to Snider Decl. (doc. no. 947). According to defendants, § 1681n(a)(1)(A) violates due process because it promotes arbitrary and discriminatory enforcement and deprives defendants of any notice of the factors that will inform the jury's decision on damages. Defendants maintain that absent some objective criteria, such as actual harm, the jury's choice is essentially arbitrary, based upon random, unspecified and inherently subjective factors. And because the statute does not clearly delineate the factors which a jury may or may not consider, defendants contend that they cannot meaningfully conduct themselves in a way to minimize their potential liability. Because of the complete lack of statutory guidance, defendants argue that § 1681n(a)(1)(A) is unconstitutionally vague. Defendants therefore urge the court to follow the district court's decision in *Grimes v. Rave Motion Pictures Birmingham, L.L.C.,* 552 F.Supp.2d 1302 (N.D.Ala.2008), which invalidated § 1681n(a)(1)(A) as unconstitutionally vague because it does not instruct a jury on the proper manner for determining a statutory damage award.

Plaintiffs, in response, point out that the *Grimes* case was overruled by the Eleventh Circuit in *Harris v. Mexican Specialty Foods, Inc.,* 564 F.3d 1301 (11th Cir. 2009). Plaintiffs also point out that even before the Eleventh Circuit rejected *Grimes* analysis, every district court to consider the *Grimes* decision declined to follow it. *See, Rosenthal v. Longchamp Coral Gables LLC,* 603 F.Supp.2d 1359, 1362 (S.D.Fla.2009) and cases therein cited. In light of these authorities and based upon the United States of America's arguments (which follow), plaintiffs contend that defendants' position has no support.

The United States of America[15] asserts that the Supreme Court's indeterminate-sentencing decisions dispose of defendants' vagueness arguments. The government specifically points to the Supreme Court's decision in *U.S. v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), wherein the Court rejected a vagueness challenge to two federal criminal statutes that prescribed different penalty ranges for the same criminal conduct. The Supreme Court concluded that although the statutes created uncertainty as to which crime may be charged and thus what penalties may be imposed, "[s]o long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." *Id.* at 123, 99 S.Ct. 2198. The government asserts that the Eleventh Circuit in *Harris* applied the Supreme Court's precedent in *Batchelder* to reject the void-for-vagueness challenge to § 1681n(a)(1)(A). The Eleventh Circuit held that the statutory damages provision is not unconstitutionally vague because (1) the statute places potential defendants on notice of the conduct that violates the FCRA and the consequences thereof; and (2) the narrow range of statutory damages does not provide so much discretion to juries as to render their verdicts arbitrary. According to the government, the notice concerns here have less resonance than in *Batchelder* because the statute at issue involves economic regulation. The government also points out that the FCRA is not alone in prescribing a range of statutory damages without specifying criteria to determine damages within its statutory range. The government specifically points to the Copyright Act, 17 U.S.C. § 504(c), which permits

statutory damages of $750 to $30,000 per infringed work and up to $150,000 per willfully infringed work. According to the government, statutory damages ranges as found in the FCRA are common and routinely upheld. The government urges the court to join other courts which have rejected the void-for-vagueness challenges to the FCRA.

Defendants, in reply, argue that criminal and copyright law are factually and legally dissimilar to the FCRA and their dissimilarities render any comparison inapposite. Defendants assert that potential vagueness concerns with the Copyright Act are lessened because the Copyright Act is not a class action vehicle in which any statutory range is multiplied by the thousands or millions of plaintiffs who are included in a given class. Rather, they argue that the Copyright Act and the other statutes cited by the government generally serve solitary plaintiffs seeking individualized damages. Defendants also assert, citing 18 U.S.C. § 3553(a) and the United States Sentencing Guidelines, that a federal criminal law provides specific factors to be considered in making an ultimate sentencing decision. It also points out that when the criminal law does provide discretion, it is in the trained hands of a judge, who must articulate specific reasons for the determination. Defendants contend that, in contrast, the FCRA gives the discretion to the jury and allows it to pick a number without providing any rationale for its decision.

Upon review, the court agrees with the Eleventh Circuit in *Harris*, as well as the other district courts, which have concluded that § 1681n(a)(1)(A) is not unconstitutionally vague on its face. Although the statute does not specify criteria for assessing

---

**15.** The court authorized the United States of America to intervene to defend the constitu-

tionality of § 1681n(a)(1)(A) under 28 U.S.C. § 2403(a).

the appropriate amount of statutory damages, the statutory damages range is relatively small. The statute clearly defines what conduct is prohibited and the potential range of damages that result from noncompliance, thereby giving potential defendants notice of the consequences of violating the statute. The court also concludes that it does not provide so much discretion to juries to render their verdicts arbitrary. It limits the juries' discretion by mandating that the statutory damages be fixed between $100 and $1,000. Thus, as indicated by the *Harris* court, the statute limits jurors' valuation of harm to a "narrow, statutorily-established range." *Harris*, 564 F.3d at 1312. In addition, the court rejects defendants' arguments that the comparisons to the Copyright Act and criminal law are inapposite. Class actions have been pursued and certified for copyright infringement. *See, In re Napster, Inc. Copyright Litigation*, 2005 WL 1287611 (N.D.Cal. June 1, 2005). In addition, as noted by the *Harris* court, the *Batchelder* decision was issued prior to the enactment of the Federal Sentencing Guidelines. *Harris*, 564 F.3d at 1312, n. 9. The Court also noted that while the *Batchelder* facts were distinguishable because it involved a criminal conviction, it had recognized that greater due process protection is required in the criminal context than in the civil context. *Id.* Based upon the authority of *Harris* and the other district courts addressing the issue, the court concludes that § 1681n(a)(1)(A) is not unconstitutionally vague. The court therefore rejects defendants' facial challenge to § 1681n(a)(1)(A) and concludes that defendants are not entitled to partial summary judgment on this issue.

H. *As–Applied Challenge to Statutory Damages Provision—Excessive Verdict*

■ Defendants also challenge the constitutionality of § 1681n(a)(1)(A) as applied to them. Defendants assert that in light of the potential size of the class, an award to plaintiffs of even the statutory minimum of $100 under § 1681n(a)(1)(A), would violate defendants' due process rights. Defendants contend that such an award would be grossly excessive and would amount to a penalty disproportionate to the offense.

In response, plaintiffs and the government contend that defendants' "as-applied" argument is premature. They argue that any questions concerning a constitutionally excessive judgment will be avoided if a verdict is rendered in favor of defendants. And if defendants are found to have willfully violated the FCRA, a decision concerning a constitutionally excessive judgment should be reached only after damages are awarded and evidence concerning the nature of defendants' conduct and their ability to pay has been considered and weighed. Plaintiffs and the government point out that the court can remedy any unconstitutionally excessive verdict by reducing the award. Thus, plaintiffs and the government urge the court to find that the as-applied due process challenge is not ripe for adjudication. If the court were to find the issue to be ripe, plaintiffs and the government argue that the statutory damages provision is constitutional as applied to defendants, when the public interests are considered, and the fact that plaintiffs were harmed by defendants' conduct and defendants have not shown that the potential statutory damages award will be "ruinous" or "annihilating" to them.

Defendants, in reply, argue that the constitutional challenge is ripe. Defendants contend that courts have considered the potential excessiveness of any damages

award well before the return of a verdict. Indeed, according to defendants, courts have decided the constitutional implications of statutory damages awards prior to class certification. Defendants assert that several of the cases relied upon by plaintiffs and the government avoided the constitutional challenge prior to class certification. Here, defendants point out that the class has been certified and argue that the constitutional challenge should be addressed. Defendants further argue that the public interest is immaterial to the issue of plaintiffs' compensatory damages. They also assert that plaintiffs' arguments regarding harm are based upon pure speculation and that the constitutional excessiveness of plaintiffs' sought-after recovery does not turn on defendants' wealth but on the relationship between the total award and the actual damages caused by the injury proven. Defendants therefore urge the court to find the issue to be ripe and conclude that any award of aggregated statutory damages, even the statutory minimum, would violate due process.

The court concludes that defendants' as-applied excessiveness challenge is not ripe for adjudication. Although a class has been certified, the exact class size has yet to be determined. Indeed, the court has made rulings in this order which may affect the size of the class. The court does not know how many individuals will be included in the class. The court similarly cannot determine what the size of the ultimate verdict will be. Further, plaintiffs must prove that defendants acted willfully in order to recover statutory damages. The court notes that court in *Ashby v. Farmers Ins. Co. of Oregon,* 592 F.Supp.2d 1307 (D.Or.2008), addressing a similar argument, concluded that the as-applied challenge was premature because it did not "have any basis for determining whether the verdict will be constitutionally excessive before there is a full hearing of all of the evidence and a decision by the jury." *Id.* at 1316. The ultimate verdict in the *Ashby* case was in favor of defendants, thereby obviating the court's need to address the as-applied challenge. *See, Ashby, et al. v. Farmers Insurance Co. of Oregon, et al.,* Case No. 01–1446 (doc. nos. 605, 614).[16] The court likewise concludes that defendants' as-applied challenge is premature. Therefore, as was the case in *Ashby* and in *Harris,* the court finds that the as-applied excessiveness challenge is not ripe for adjudication. *See, Ashby,* 592 F.Supp.2d at 1316; *Harris,* 564 F.3d at 1310. The court therefore concludes that defendants are not entitled to summary judgment on this issue.[17]

I. *Recovery of Statutory Damages in Excess of $100 in Absence of Any Evidence of Injury or Harm*

■■■ Defendants assert that should the court decline to declare § 1681n(a)(1)(A)

---

16. The court also notes that the *Ashby* case was appealed to the Ninth Circuit Court of Appeals but voluntarily dismissed upon stipulation of the parties. *See,* Ninth Circuit Case No. 09–35972.

17. The court is at pains to note that it is well aware that defendants are financial institutions (or closely related to financial institutions) and that, with respect to overhanging liabilities, financial institutions, as civil litigants, are *sui generis.* The court is well-satisfied that it (and any transferor courts to which any of these actions may ultimately be returned) possesses the equitable and other powers necessary to mitigate, to the extent reasonably possible, the dire consequences that are implicit in defendants' arguments with respect to the availability of statutory damages.

unconstitutional facially or as applied, the court should rule that plaintiffs may not seek statutory damages in excess of $100 per class member, in the absence of evidence of actual harm or injury. Defendants maintain that statutory damages must be proportionate to possible actual damages and may not be arbitrary and oppressive. Because plaintiffs have disavowed any evidence of actual harm or injury due to the alleged violation of the FCRA, defendants argue that any award above the statutory minimum would be completely arbitrary and anything more than a *de minimis* award would be disproportionate to a nonexistent injury. Defendants therefore assert that the court should limit plaintiffs' statutory damages to $100 per person, in the absence of individualized evidence of harm or injury.

Plaintiffs, in response, contend that defendants are recycling an argument previously rejected by the court at the class certification stage. Plaintiffs assert that there is nothing in the remedy provisions of the FCRA which suggest that harm to the consumer is a relevant consideration to the determination of statutory damages. According to plaintiffs, the FCRA's remedial scheme provides for statutory damages in lieu of actual damages to alleviate the ordinary burdens of proof inherent in an actual damages award. Because an award of statutory damages does not require proof of actual injury, plaintiffs contend that they are not limited to statutory damages of $100 in the absence of individualized evidence of harm.

Defendants argue, in reply, that whether the Constitution permits the class to recover the statutory minimum without demonstrating any actual damages is a separate question from whether a jury, consistent with the Constitution, may arbitrarily go beyond that minimum without an evidentiary basis upon which to do so. Defendants contend that a jury cannot pick its number for statutory damages blindly; it must act consistently with the compensatory purpose of the statutory damages provision. Thus, defendants argue that it would be both excessive and arbitrary for a jury to choose a number greater than the minimum without some corresponding actual harm to plaintiff.

The court has previously concluded that the recovery of statutory damages under the FCRA is not dependent on proof of injury or harm. *See, In re Farmers Ins. Co., Inc., FCRA Litigation,* 2006 WL 1042450 at *9. Therefore, plaintiffs are not required to present individualized proof of injury or harm from each class member in order to obtain an award of statutory damages. The court is not convinced at this point that any award above the statutory minimum, $100, would be arbitrary and violative of defendants' due process rights. The court concludes that a reasonable jury should be able to determine the proper amount of damages within the statutory range. The court is also mindful of its post-verdict responsibilities under Rules 59, 60 and 62, Fed.R.Civ.P. The court therefore concludes that defendants are not entitled to summary judgment on this issue.

### J. *Private Enforcement of Plaintiffs' Claims*

Finally, defendants contend that the FCRA itself bars plaintiffs' claims in their entirety. According to defendants, the FACTA[18] amendments to the FCRA in 2003 amended § 1681m by adding subsec-

---

**18.** Fair and Accurate Credit Transaction Act ("FACTA").

tion (h)(8), which provides that "[s]ection[ ] § 1681n . . . of this title shall not apply to any failure by any person to comply with this section." 15 U.S.C. § 1681m(h)(8)(A). Defendants assert that the FACTA amendments also provide that § 1681m "shall be enforced exclusively under section 1681s of this title by the Federal agencies and officials identified in that section." 15 U.S.C. § 1681m(h)(8)(B). Defendants state that in enacting the FACTA amendments, Congress eliminated private enforcement of violations of § 1681m.

Although defendants recognize that the FACTA amendments were enacted after plaintiffs filed suit, defendants contend that § 1681m(h)(8) should be applied to the prosecution of plaintiffs' claims because it does not have an impermissible retroactive effect. Defendants argue that § 1681m(h)(8) does not attach new legal consequences to the events completed before its enactment. According to defendants, § 1681m(h)(8) does not change defendants' liability to plaintiffs or the putative class, it simply changes who is permitted to bring such claims. Defendants contend that plaintiffs' claims must now be brought by the "chief law enforcement officer of a State"—not private class action counsel and class representatives. *See,* 15 U.S.C. §§ 1681m(h)(8)(B), 1681s(c)(1).

Plaintiffs, in response, contend that defendants' argument is frivolous. Plaintiffs assert that not only did FACTA not bar plaintiffs' claims against defendants, it expressly preserved those claims in section 312(f). Given the plain language of section 312(f), plaintiffs assert that defendants' "retroactive effect" argument is irrelevant. Nonetheless, plaintiffs contend that defendants' argument has been rejected by every court to consider the issue, including *Ashby.*

Defendants, in reply, contend that section 312(f) states only that FACTA should not be construed to affect any "liability" under § 1681n that existed on the day before the date of its enactment. Defendants contend that § 1681m(h)(8) does not affect defendants' "liability" under the FCRA; it merely shifts enforcement of the FCRA from private parties to the government. Defendants argue that their liability and obligations under the FCRA are still the same as they were before the enactment of the FACTA, the only difference being that the enforcement of the statute is now entrusted to the government alone. Because defendants' liability has not changed, § 1681m(h)(8) does not fall within section 312(f)'s prospective-only sweep.

Defendants also contend that it is clear from the Supreme Court and Tenth Circuit precedents that the ban on retrospective application of statutes is concerned with statutes that impose new burdens on parties, not with statutes that either shift or relieve them. Defendants contend that § 1681m(h)(8) is a procedural law that merely shifts burdens. Because the statute only shifts burdens, defendants maintain that retrospective application is required. Consequently, defendants contend that the court should find that plaintiffs do not have a private right of action under § 1681m(a) and grant summary judgment in their favor.

■ Upon review of the applicable law, the court concludes that § 1681m(h)(8) does not apply to plaintiffs' pending FCRA claims. The court concludes that section 312(f) of FACTA preserved plaintiffs' claims. That section provides in pertinent part:

Nothing in this section, the amendments made by this section, or any other provi-

sion of this Act shall be construed to affect any liability under section 616 or 617 of the Fair Credit Reporting Act [15 U.S.C. § 1681n and 15 U.S.C. § 1681o] that existed on the day before the date of enactment of this Act.

Pub.L. 108–159, § 312(f), 117 Stat.1952, 1993 (2003). FACTA was enacted on December 4, 2003. It is undisputed that the alleged conduct in this case occurred prior to FACTA's enactment. The court, following the majority of courts which have addressed the issue, concludes that section 312(f) defeats defendants' argument that § 1681m(h)(8) applies to the prosecution of plaintiffs' claims. *See, Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 621 (7th Cir.2007) (observing that "FACTA's section 312(f) preserves private causes of action for liability that accrued prior to FACTA's date of enactment"); *Meyers v. Freedom Credit Union*, 2007 WL 2753172 at *6 (E.D.Pa. Sept. 21, 2007) ("[Section 312(f) ] is a clear statement that Congress did not intend FACTA to apply to conduct prior to the date of its enactment"); *Grab v. Am. Lawyers Co.*, 2007 WL 842045 at *7 (D.Haw. Mar. 19, 2007) ("[Section 312(f) ] indicates that Congress did not intend to bar lawsuits stemming from conduct that occurred before the date FACTA was enacted, December 4, 2003."); *Miller v. CoreStar Fin. Group of Pa., Inc.*, 2007 WL 419194, at *3 (E.D.Pa. Feb. 5, 2007) ("[Section 312(f) ] supports the conclusion that Congress did not intend to bar lawsuits stemming from conduct that occurred before the date FACTA was enacted, December 4, 2003.") The court rejects defendants' argument that § 1681m(h)(8) does not affect defendants' "liability." It does affect defendants' liability to plaintiffs under § 1681n. It eliminates a private right of action by plaintiffs against defendants for recovery of statutory damages for the alleged violations of § 1681m(a). The court therefore concludes that plaintiffs' claims are preserved under section 312(f)

In addition, the court rejects defendants' retroactivity argument. The court agrees with and follows those courts which have found that FACTA should not be applied retroactively on the ground that a plaintiff's pre-FACTA right to bring a private civil action for damages would be impaired. *See, Killingsworth*, 507 F.3d at 622–23 ("[P]rior to FACTA's effective date, [plaintiff] had a right of private civil action for damages, a right that would be impaired if FACTA's repeal of private rights of action were applied retrospectively ... The amendment therefore has an impermissible retroactive effect on claims like [plaintiff's] that accrued prior to its December 1, 2004 effective date"); *see also, Ashby*, 565 F.Supp.2d at 1192–93; *Meyers*, 2007 WL 2753172 at *7; *Grab*, 2007 WL 842045 at *7. The court therefore rejects defendants' argument that the FCRA bars plaintiffs' claims.

In sum, the court finds that Defendants' Motion for Summary Judgment should be granted in part and denied in part.

*Plaintiffs' Cross Motion for Partial Summary Judgment on Certain Affirmative Defenses*

Plaintiffs seek, pursuant to Rule 56, partial summary judgment as to certain affirmative defenses asserted by defendants in their answer to Plaintiffs' Consolidated and Amended Class Complaint. *See,* Answer and Affirmative Defenses to Plaintiffs' Consolidated and Amended Class Action Complaint (doc. no. 567). Plaintiffs contend that defendants cannot show a genuine issue of material fact on the challenged affirmative defenses. The court will address each of the defenses in the

order in which they are discussed by plaintiffs in their motion.

### A. Plaintiffs' Consolidated and Amended Class Action Complaint Fails to State a Claim Upon Which Relief may be Granted.

■ Plaintiffs contend that they have alleged the elements of a claim for violation of Section 615(a) of the FCRA, 15 U.S.C. § 1681m(a). Accordingly, plaintiffs contend that this defense fails as a matter of law.

Defendants do not concede that plaintiffs have alleged a viable FCRA claim. Defendants do not agree that its FCRA notice violated § 1681m(a) as a matter of law and believes that many plaintiffs received oral "notice of the adverse action." Defendants do not concede that FGI may be held liable for any violation of § 1681m(a) or that all of the plaintiffs suffered any adverse action within the meaning of the FCRA. Furthermore, defendants contend that they did not willfully violate the FCRA, as plaintiffs contend. Defendants assert that their conduct was objectively reasonable and may not give rise to willful liability under *Safeco*. Consequently, defendants argue that plaintiffs' motion should be denied.

The court concludes that plaintiffs are not entitled to partial summary judgment in regard to defendants' defense that Plaintiffs' Consolidated and Amended Class Action Complaint fails to state a claim upon which relief may be granted. The court, in this order, has granted summary judgment in regard to certain plaintiffs' claims against defendants and as to all of the plaintiffs' claims against FIRE and FUA. Those claims are out. But, as the court has previously determined in

these proceedings, the issue of willfulness remains for trial. Although, from a procedural standpoint, this may seem to be a rather dry technicality, Rule 12(h)(2)(C) specifically permits the defense of failure to state a claim to be raised at trial. Plaintiffs have not shown that they are entitled to judgment as a matter of law as to this defense.

### B. Any Statutorily Required Notice Pursuant to FCRA was Provided to Plaintiffs.

■ Plaintiffs contend that the court has already determined that defendants' written FCRA notices did not comply with § 1681m(a). Plaintiffs also contend that there is no evidence that defendants provided oral or electronic notice of adverse action within the meaning of § 1681m(a).

Defendants, in response, contend that even though the court has held that defendants' written FCRA notice insufficiently provided "notice of the adverse action," the written notice was supplemented by verbal communications from defendants' agents that satisfied defendants' notice obligation.

The court, as pointed out by plaintiffs and acknowledged by defendants, has previously concluded that the FCRA notice provided by defendants did not comply with FCRA. Although defendants contend that written notice was supplemented by verbal communications with defendants' agents, defendants, in their motion for summary judgment, have provided evidence of verbal communications relating only to plaintiffs Cearlock and Watts. The claims of plaintiff Watts against defendants remain, as has been stated in this order. The court has concluded that defendants are not entitled to summary judgment to plaintiff Watts' FCRA claim relat-

ing to the premium increase at transition renewal of his homeowners policy (No. 917108300) on April 30, 2001. The court did not grant summary judgment in defendants' favor on this claim based upon oral notice of adverse action. But neither is plaintiff Watts entitled to summary judgment on defendants' defense as to this claim. Fact issues preclude summary judgment either way with respect so the asserted oral notice. The court also declines to enter summary judgment against defendants as to defendants' defenses to the other FCRA claims asserted by plaintiff Watts.

The court concludes that plaintiffs Harry Corl and Donna S. Mobbs are entitled to partial summary judgment on defendants' oral notice defense. Defendants have provided evidence of alleged oral notice of adverse action only as to plaintiffs Cearlock and Watts.

### C. *Reasonable Procedures Were Maintained by Defendants to Assure Compliance With the FCRA*

■■■ Section 615 of the FCRA provides that "[n]o person shall be held liable for any violation of this section if he shows by a preponderance of the evidence that at the time of the alleged violation he maintained reasonable procedures to assure compliance with the provisions of this section." 15 U.S.C. § 1681m(c). Citing to *Mathews v. Government Employees Ins. Co.*, 23 F.Supp.2d 1160, 1163 (S.D.Cal. 1998), plaintiffs contend that defendants may not rely upon the "reasonable procedures" defense because it only applies to those who inadvertently violate the law in isolated instances. Plaintiffs contend that defendants' procedure was to disseminate defective written notices to thousands of policyholders.

Defendants contend that courts, in evaluating the reasonable procedures defense, have held that it requires a showing of "reasonable care." *See, e.g., Spence v. TRW, Inc.*, 92 F.3d 380, 383 (6th Cir.1996). Defendants assert that there is overwhelming evidence that defendants exercised reasonable care in seeking to comply with § 1681m(a). Defendants point out that they adopted the most conservative interpretation of who should receive notice and sent their notices to every insured who was charged more than the theoretical best premium. They also point out that they relied upon in-house counsel and nationally-recognized FCRA specialists to advise them on the obligations under the FCRA. Further, they point out that they voluntarily chose to revise their FCRA notices in September 2002. Defendants contend that this evidence shows that they acted reasonably and had reasonable procedures in place in seeking to comply with § 1681m.

The court concludes that plaintiffs have failed to show that they are entitled to judgment as a matter of law on this defense. The court thus concludes that plaintiffs are not entitled to partial summary judgment on this defense.

### D. *Each Individual and Putative Class Plaintiff Lacks Standing to Bring the Claims in Plaintiffs' Consolidated and Amended Class Action Complaint*

Plaintiffs agree that they do not have standing to assert individual claims against defendants FIRE and FUA. However, they do contend that they have standing to assert claims against their insurers, defendants FICI, FIE, and Mid–Century. They also contend that they have standing to assert claims against defendant FGI,

the entity that created and disseminated the defective FCRA notices at issue. Accordingly, with respect to defendants FICI, FIE, Mid–Century and FGI, plaintiffs contend that the lack-of-standing defense fails.

The court finds that plaintiffs are not entitled to partial summary judgment in regard to this defense as to defendants FIRE and FUA. Based upon plaintiffs' concession that they lack standing to bring suit against FIRE and FUA, the court has herein granted defendants summary judgment on plaintiffs' claims against FIRE and FUA.

As to defendant FGI, the court finds that plaintiffs are entitled to partial summary judgment on this defense. Plaintiffs have standing to bring claims against FGI, and FGI is a proper party to this action.

Defendants do not challenge plaintiffs' standing to assert claims against defendants FICI, FIE and Mid–Century. Consequently, the court finds that plaintiffs are entitled to partial summary judgment in regard to this defense as to plaintiffs' claims against defendants FICI, FIE and Mid–Century.

E. *Plaintiffs' Claims are Barred in Whole or in Part by the Doctrines of Waiver and/or Estoppel*

In their motion, plaintiffs contend that defendants have no evidence that plaintiffs intended to relinquish their rights under the FCRA or made representations or engaged in conduct that induced defendants to act. Plaintiffs therefore contend that defendants' defenses of waiver and estoppel fail as a matter of law.

Defendants, in response, assert that plaintiffs have waived and are estopped from asserting any claim for actual damages or punitive damages based upon defendants' alleged willful violation of the FCRA. Defendants specifically point to documents in this case wherein plaintiffs have waived their claims for actual damages and punitive damages.

The court concludes that plaintiffs are entitled to partial summary judgment as to this defense. Plaintiffs' Consolidated and Amended Class Action Complaint does not seek actual or punitive damages. Rather, the amended complaint requests statutory damages, costs and attorneys' fees. As actual and punitive damages are not put in issue by the amended complaint, the court concludes that defendants' waiver and estoppel arguments are of no legal consequence in this case.

F. *Plaintiffs' Claims are Barred by the Applicable Statute of Limitations*

Plaintiffs contend that their claims are not barred by the applicable statute of limitations. Defendants contend that this is a valid defense and that plaintiffs are not entitled to partial summary judgment.

In this order, the court has addressed the limitations issue. The court concludes that plaintiffs' claims against FGI for adverse actions arising on or before September 28, 1999 are timely.

The court concludes that the claims against FIE arising from adverse action taken on or after July 15, 2000 are timely.

The court concludes that the claims against FICI arising from adverse action taken on or after February 6, 2001 for Oklahoma homeowners; on or after February 12, 2001 for non-Oklahoma homeowners and on or after June 1, 2001 for automobile policies everywhere are timely.

In regard to Mid–Century, the claims against Mid–Century arising from adverse actions taken on or after October 27, 2001 are timely.

The court concludes that plaintiffs are entitled to partial summary judgment in regard to the statute of limitations defense to the extent stated in this order.

### G. The Claims of Plaintiff Watts and Any Putative Class Member Insureds in the State of Texas are Barred by Prior Settlement and Release

 Plaintiffs contend that there is no final court-approved settlement in Texas. According to plaintiffs, preliminary approval of a settlement between various Farmers entities and the state of Texas was reversed on appeal. The Texas Supreme Court reversed the court of appeals' judgment and remanded the case to the court of appeals for further proceedings. Because there is no final court-approved settlement, plaintiffs contend that defendants are not entitled to assert this defense.

Defendants contend that the defense remains a valid defense until the settlement agreement and release is definitively ruled on by the Texas state courts. Therefore, defendants specifically assert that this defense remains viable as to the claims of plaintiff Watts and the other putative Texas class members.

The court concludes that plaintiffs are not entitled to summary judgment as a matter of law on this defense. The court notes that on remand from the Texas Supreme Court, the Court of Appeals of Texas—Austin affirmed the district court's certification order, *Lubin v. Farmers Group, Inc.*, 2009 WL 3682602 (Tex.App.-Austin Nov. 6, 2009).

### H. Plaintiffs' Attempt to Aggregate Statutory Damages on a Class–Wide Basis is Barred by the Due Process Clause of the United States Constitution

Plaintiffs contend that for the reasons previously discussed in response to defendants' summary judgment motion, this defense fails as a matter of law.

Defendants, in response, contend that for the reasons previously raised in their summary judgment motion, the defense is valid.

The court has concluded that defendants' as-applied due process challenge to FCRA's statutory damage provision is not ripe and is premature. The court therefore concludes that plaintiffs are not entitled to partial summary judgment as to defendants' as-applied due process challenge to FCRA's statutory damage provision defense.

The court, however, concludes that plaintiffs are entitled to partial summary judgment as to the facial due process challenge—unconstitutionally vague—for the reasons previously stated in this order.

### I. Private Enforcement of Plaintiffs' Claims is Barred by 15 U.S.C. § 1681m(h)(8)

Plaintiffs contend that their claims are not barred by § 1681m(h)(8). Defendants, however, contend that they are barred.

The court has previously concluded that § 1681m(h)(8) does not apply to plaintiffs' claims and plaintiffs' claims are not barred. Given the court's previously-stated conclusions on this issue, the court finds that plaintiffs are entitled to partial summary judgment as to defendants' affirmative defense that private enforcement of plain-

tiffs' claims is barred by 15 U.S.C. § 1681m(h)(8).

In sum and for the reasons stated herein, the court finds that Plaintiffs' Cross Motion for Partial Summary Judgment should be granted in part and denied in part.

*Conclusion*

Based upon the foregoing, Defendants' Motion for Summary Judgment (doc. no. 945) is **GRANTED in part** and **DENIED in part.**

Defendants' motion is granted as to:

1. All FCRA claims of plaintiffs, Nyle Cearlock, Arlene Hancock and Cynthia L. Hodnett;

2. The FCRA claims of plaintiff, Harry Corl, relating to the subsequent renewals of his automobile policies (Nos. 1505401061 and 146290921);

3. The FCRA claims of plaintiff, David L. Watts, Jr., relating to the subsequent renewals for his automobile policy (No. 122067280) and the subsequent renewal for his automobile policy (No. 154944718); and

4. All FCRA claims against defendants, Fire Insurance Exchange and Fire Underwriters Association.

Defendants' motion is denied in all other respects.

Plaintiffs' Cross Motion for Partial Summary Judgment on Certain Affirmative Defenses (doc. no. 952) is also **GRANTED in part** and **DENIED in part.**

Plaintiffs' motion is granted as to:

1. Defendants' defense against plaintiffs Harry Corl and Donna S. Mobbs that "Any Statutorily Required Notice Pursuant to FCRA was Provided to Plaintiffs;"

2. Defendants' defense that plaintiffs "Lack Standing to Bring the Claims in Plaintiffs' Consolidated and Amended Class Action Complaint" as to defendants, Farmers Group, Inc., Farmers Insurance Company, Inc., Farmers Insurance Exchange and Mid–Century Insurance Company;

3. Defendants' defense that "Plaintiffs Claims are Barred in Whole or in Part by the Doctrines of Waiver and/or Estoppel;"

4. Defendants' defense that "Plaintiffs' Claims are Barred by the Applicable Statute of Limitations" to the extent stated in this order;

5. Defendants' defense that "Plaintiffs Attempt to Aggregate Statutory Damages on a Class–Wide Basis is Barred by the Due Process Clause of the United States Constitution" as to the facial due process challenge; and

6. Defendants' defense that "Private Enforcement of Plaintiffs' Claims is Barred by 15 U.S.C. § 1681m(h)(8)."

Plaintiffs' motion is denied in all other respects.